1

```
 1                  IN THE UNITED STATES DISTRICT COURT
                      NORTHERN DISTRICT OF ILLINOIS
 2                          EASTERN DIVISION

 3
    UNITED STATES OF AMERICA,       ) Docket No. 20 CR 688-2
 4                                  )
                         Plaintiff,)
 5                                  )
                   vs.              )
 6                                  )
    GEE SIONG KOK,                  ) Chicago, Illinois
 7                                  ) December 1, 2022
                        Defendant.) 2:00 o'clock p.m.
 8

 9     TRANSCRIPT OF PROCEEDINGS - VIDEOCONFERENCE CHANGE OF PLEA
             BEFORE THE HONORABLE JOHN J. THARP, JR.
10

11  VIDEOCONFERENCE APPEARANCES:

12
    For the Plaintiff:          HON. JOHN R. LAUSCH, JR.
13                              United States Attorney
                                BY:  MS. MELODY WELLS
14                                   MR. STEVEN J. DOLLEAR
                                219 S. Dearborn St., Suite 500
15                              Chicago, Illinois  60604

16
    For the Defendant:          MURPHY LAW GROUP, LLC
17                              BY:  MR. EUGENE E. MURPHY, JR.
                                161 North Clark Street, Suite 2550
18                              Chicago, Illinois  60601

19
    Court Reporter:             MR. JOSEPH RICKHOFF
20                              Official Court Reporter
                                219 S. Dearborn St., Suite 2128
21                              Chicago, Illinois  60604
                                (312) 435-5562
22
                    *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *
23
                          PROCEEDINGS RECORDED BY
24                         MECHANICAL STENOGRAPHY
                       TRANSCRIPT PRODUCED BY COMPUTER
25
```

1          (Proceedings had via videoconference:)

2              THE COURT:  Good afternoon, this is Judge Tharp.

3    Calling the case of United States vs. Kok, 20 CR 688-2.

4              Do we have counsel for the United States on the line?

5              MS. WELLS:  Yes, your Honor, Melody Wells and Steve

6    Dollar for the United States.

7              THE COURT:  All right.  Good afternoon.

8              Do we have counsel for Mr. Kok on the line?

9              MR. MURPHY:  We do, Judge.  Gene Murphy for Mr. Kok.

10             THE COURT:  And Mr. Kok is on the line, as well, by

11   video?

12             THE DEFENDANT:  I am, your Honor.

13             THE COURT:  We're here for a change of plea hearing.

14   Are we prepared to go forward?

15             MR. MURPHY:  We are, Judge.

16             MS. WELLS:  Yes, your Honor.

17             THE DEFENDANT:  Yes, your Honor.

18             THE COURT:  Mr. Kok, we're going to go through a

19   process this afternoon that is required in order for me to

20   make a determination of whether it's appropriate to accept a

21   plea of guilty to any of the charges that have been brought

22   against you.  In order to make that determination, I

23   essentially have to make sure that you know what you're doing;

24   that you know that you give up very important rights if you

25   plead guilty; that you're competent to plead guilty; that

1    you've had the assistance of counsel; and, that your decision

2    to plead guilty is one you have reached voluntarily, not one

3    that has been thrust upon you in some fashion.

4           In order to make those determinations, I will have to

5    ask you quite a few questions this afternoon.  It's important

6    that you answer those questions truthfully and accurately for

7    several reasons.  First, in just a moment, I'll put you under

8    oath, and it can be a federal crime to make false statements

9    under oath.  So, you don't want to do that.  And, second, I

10   need accurate information in order to make the determination

11   of whether I can accept the plea of guilty.

12          So, it's important that you answer questions

13   truthfully and accurately.  To do that, you have to understand

14   the questions.  If you have any -- if you don't understand

15   something that I'm asking you about and would like me to try

16   to clarify it, let me know that and I'm happy to do that.

17          Also, if you wish to confer with your attorney at any

18   point during these proceedings before answering a question,

19   let me know that, as well, and we have the ability in this

20   software program to allow you and your counsel to have a

21   private conversation.  All right?

22          Okay.  Would you please raise your right hand.

23          THE DEFENDANT:  Okay.

24      (Defendant sworn.)

25          THE COURT:  Thank you.  You may put your hand down

1    now.

2            THE COURT REPORTER:  Judge, I don't think we're

3    hearing Mr. Kok.

4            THE COURT:  Is that Joe?

5            THE COURT REPORTER:  Yes.  I'm sorry, Judge.  Yes.  I

6    can't hear him.

7            THE COURT:  Mr. Kok, if you could get a little closer

8    to your microphone and try to speak directly into that, that

9    would help our court reporter who is taking down the

10   transcript.

11           We've got your oath on record, however, so you can

12   put your hand down.  All right.

13           MR. MURPHY:  Judge -- Judge, I --

14           THE COURT:  Hold on.

15           MR. MURPHY:  Gee, speak as if you're speaking to a

16   large group, okay?  Sometimes microphones aren't all that

17   great.  So, belt it out nice and loud.  It's the most

18   important thing that the court reporter hears you, okay?

19           THE DEFENDANT:  Okay.  Thank you.

20           MR. MURPHY:  I'm sorry, Judge.

21           THE COURT:  That's all right.  Thank you.

22           The first order of business is obviously we are not

23   in person in the courtroom here in Chicago.  Mr. Kok is

24   appearing from --

25           Where are you, Mr. Kok?

1          THE DEFENDANT:  I'm in -- at home in England.

2          THE COURT:  England?

3          THE DEFENDANT:  Yes.

4          THE COURT:  And your attorney is, where?

5          MR. MURPHY:  Judge, I'm in Chicago.  I'm a couple

6     blocks away.

7          THE COURT:  Okay.

8          Do you understand, Mr. Kok, that you have the right

9     to have this hearing take place in person in the courtroom

10    here in Chicago if you choose to do so?

11         THE DEFENDANT:  Yes, I understand.

12         THE COURT:  And it's my understanding, from

13    information your counsel has provided, that you've requested

14    that this hearing take place by video rather than by appearing

15    in person in the courtroom; is that correct?

16         THE DEFENDANT:  Yes, that's correct.

17         THE COURT:  And that's in large measure to save you

18    the burden and inconvenience and exposure to potential COVID

19    and other pathogens that we're all still trying to avoid; is

20    that correct?

21         THE DEFENDANT:  Correct, yes, your Honor.

22         THE COURT:  All right.

23         Have you had enough time to talk with Mr. Murphy,

24    your attorney, about proceeding by video or in person?

25         THE DEFENDANT:  Yes.

```
 1              THE COURT REPORTER:  I'm sorry, Judge, I didn't hear
 2   his answer.  I'm sorry.  This is Joe.
 3              THE DEFENDANT:  Yes.
 4              THE COURT:  Have you had enough time to talk with
 5   Mr. Murphy, your attorney, about proceeding by video or in
 6   person?
 7              THE DEFENDANT:  Yes, I had conversation with Gene
 8   Murphy, your Honor.
 9              THE COURT:  All right.
10              And is it your voluntary decision to request that
11   this hearing take place by video rather than in person?
12              THE DEFENDANT:  Yes.
13              THE COURT:  All right.
14              Do you voluntarily waive your right to have this
15   hearing take place in person?
16              THE DEFENDANT:  Yes, your Honor.
17              THE COURT:  All right.
18              I find that Mr. Kok has voluntarily and knowingly
19   waived his right to proceed by video -- or, excuse me, by an
20   in-person appearance in court, and consequently we will
21   proceed, as we are, by videoconference.
22                              EXAMINATION
23   BY THE COURT:
24   Q.  Mr. Kok, could you state your full name, please.
25   A.  My full name is Gee Siong Kok.
```

```
 1   Q.   Could you spell that for our court reporter?

 2   A.   G-double e, space, S-i-o-n-g, space, K-o-k.

 3   Q.   Thank you.

 4            How old are you, sir?

 5   A.   I'm 64 years old.  64, your Honor.

 6   Q.   Do you presently live in London?

 7   A.   Not in London, in England.  I'm in a small town in the

 8   west of London, Weston super Mare.

 9   Q.   And are you married?

10            THE COURT REPORTER:  I'm sorry, Judge, this is Joe.

11   I didn't hear the last part.  West London, did he say?

12            THE DEFENDANT:  West of London in a town called

13   Weston super Mare.  W-e-s-t-o-n-s-u-p-e-r-M-a-r-e.

14   BY THE COURT:

15   Q.   Are you married, sir?

16   A.   Yes, your Honor.

17   Q.   How long have you been married?

18   A.   40 years.

19   Q.   4-0?

20   A.   4-0, your Honor.

21   Q.   Okay.

22            Do you have children?

23   A.   Yes.  I have five children.

24   Q.   Are they all adults at this stage?

25   A.   Yes, all of them are adults, your Honor.
```

```
 1   Q.   Okay.
 2            What's the highest level of formal education you've
 3   completed?
 4   A.   Degree in communication engineering.
 5   Q.   Is that a college or university-level degree?
 6   A.   University-level degree.
 7   Q.   And where did you attend university?
 8   A.   I attend University in Plymouth, England.  Plymouth
 9   University, England.
10   Q.   So, I take it you're able to read and write English?
11   A.   Yes, your Honor.
12   Q.   Though English is not your native language; is that
13   correct?
14   A.   It's my preferred language, your Honor.
15   Q.   All right.
16   A.   My native English -- my native language is Hokkien, which
17   is a Chinese dialect.
18   Q.   And you prefer to proceed in English rather than in your
19   native language?
20   A.   Yes, your Honor.
21   Q.   Okay.
22            And are you presently employed?
23   A.   No, I'm not employed.
24   Q.   All right.  When did your employment end?
25   A.   Around 2 --
```

1   Q.  Let me rephrase that.  I'm sorry, let me rephrase that

2   question.

3          What's the last, most recent job that you've held?

4   A.  The last job that I held was with Hytera Communications in

5   England.

6   Q.  Okay.

7          And before working for Hytera, did you work for

8   Motorola?

9   A.  Yes, I did.

10   Q.  And did your work for those two companies span several

11   decades at least?

12   A.  Yes, your Honor.

13   Q.  Do you feel like you're in good physical health?

14   A.  Just normal old age stuff.  Other than that, yes,

15   physically, I'm in good health.

16   Q.  All right.

17          Do you take any prescription medications?

18   A.  Yes, I have prescription medication.

19   Q.  Do any of those medications affect your ability to think

20   clearly?

21   A.  No.  Those --

22   Q.  Have you --

23   A.  Those medications are for pain.

24   Q.  All right.

25          Have you had any of those medications today?

1  A.  In the morning, yes.

2  Q.  And is that a regular time that you take your medications?

3  A.  Yes, it is, your Honor.

4  Q.  All right.

5      Do those medications that you've taken this morning

6  have any effect on your ability to think clearly this

7  afternoon?

8  A.  No.

9  Q.  And have you ever been under the care of any mental health

10 professional?

11 A.  No.

12 Q.  Other than the medications that we just talked about, have

13 you had any other drugs or alcohol in the last 24 hours?

14 A.  No.

15 Q.  Is there any reason that you do not feel physically or

16 mentally up to making important decisions here this afternoon?

17 A.  No.

18      THE COURT:  Mr. Murphy, do you have any reason to

19 doubt Mr. Kok's competence to enter a plea of guilty at this

20 time?

21      MR. MURPHY:  No, Judge.  I believe he's competent.

22      THE COURT:  Does the government have any reason to

23 doubt or question Mr. Kok's competence?

24      MS. WELLS:  No, your Honor.

25      THE COURT:  Based on my own observation of Mr. Kok

1    and his demeanor by video, and based also on the substance of

2    his responses to the Court's questions, I have no reason to

3    believe that Mr. Kok is not competent to enter a plea of

4    guilty at this time.

5    BY THE COURT:

6    Q.  Mr. Kok, can you tell me who the attorney is that

7    represents you in this case?

8    A.  Gene Murphy.

9    Q.  Have you had enough time to talk with Mr. Murphy about

10   this case generally?

11   A.  Yes.  I've spoken to Gene this week.

12   Q.  All right.

13         Not just this week, but have you had time to talk

14   with him previously, as well?

15   A.  Yes, your Honor.  We have been in constant communication.

16   Q.  Okay.

17         And have you had enough time to talk with him about

18   what we're doing here this afternoon, entering a guilty plea

19   to one of the charges against you?

20   A.  Yes, we have spoken on this, your Honor.

21   Q.  Do you feel like you need to confer any further with Mr.

22   Murphy before we proceed?

23   A.  No, your Honor.

24   Q.  All right.

25         Are you satisfied with the advice and counsel that

1    Mr. Murphy has provided to you as your attorney?

2    A.  Yes, your Honor.

3    Q.  Is there anything you think he should have done for you as

4    your attorney that he has not done?

5    A.  No.

6    Q.  I'm sure one of the things that Mr. Murphy has talked to

7    you about are the rights that you give up by pleading guilty.

8    These rights are so important that we're required to go

9    through them on the record with you to make sure that you've

10   heard and understand them.

11          When I'm talking to you about these rights, they all

12   start with the fundamental proposition that under the law, you

13   are presumed to be not guilty of any of the charges that have

14   been brought against you.

15          Do you understand that?

16   A.  Yes, your Honor.

17   Q.  And because under the law you are presumed to be not

18   guilty of those charges, the law places the burden of proof in

19   this case on the government, and the government's burden here

20   is to present evidence sufficient to prove your guilt beyond a

21   reasonable doubt.  That's the standard and burden of proof

22   that apply in a federal criminal case.

23          Do you understand that?

24   A.  Yes, your Honor.

25   Q.  And the way that we put the government to its burden is by

1  having a jury trial.  And I'll talk to you about a jury trial

2  in just a minute.  The first thing I want to tell you is

3  during the course of this prosecution, including any trial,

4  you have the right to have counsel represent you.

5       Do you understand that?

6  A.  Yes, your Honor.

7  Q.  Mr. Murphy is presently your counsel.  If he was unable to

8  continue for any reason, we would give you the opportunity to

9  retain new counsel; or, if you could not afford new counsel,

10  counsel would be appointed to represent you.

11      Do you understand that?

12  A.  Yes, your Honor.

13  Q.  You also have the right to have the trial in this matter

14  take place in a public forum, in a public courtroom.  The

15  government can't take you off somewhere and have a trial in

16  secret.  And proceedings would be open to your family, your

17  friends, colleagues, co-workers, the media, strangers off the

18  street who just wanted to see a trial.  Anybody that wanted to

19  be present in the courtroom would be permitted to observe the

20  trial.

21      Do you understand you have the right to a public

22  trial?

23  A.  Yes, I do, your Honor.

24  Q.  All right.

25      Now, a jury trial starts with the selection of a

1    jury.  And a jury is just a group, in a criminal case, of 12

2    citizens who are called to serve as jurors in the case.  And

3    the responsibility of the jurors collectively is to listen to

4    the evidence that's presented in the trial and decide whether

5    that evidence proves the defendant guilty of any of the

6    charges beyond a reasonable doubt.  That's the jury's basic

7    function.

8          Do you understand that?

9    A.  Yes, your Honor.

10    Q.  All right.

11          Now, we don't just take 12 people off the street at

12    random and tell them you're going to be the jurors in this

13    case.  We go through a very rigorous selection process to pick

14    people who we believe will be fair and impartial jurors in

15    this particular case.  And in that process, you and Mr. Murphy

16    have a very big role to play and ultimately a very big say in

17    determining who the jurors in this case will be.  Let me

18    explain why.

19          First, when we call in potential jurors to serve in

20    the case, we ask them questions so that we can get information

21    about their background, their attitudes, their experiences, in

22    order to assess whether we think that they are going to be

23    fair and impartial jurors in this case.  Mr. Murphy can

24    participate in that process by submitting questions that we

25    would ask those potential jurors, and he might even be able to

1    pose some of the questions to the jurors himself.

2            So, number one, you'd participate in the questioning

3    of the jurors.  Number two, if you and Mr. Murphy think

4    someone's not going to be fair and impartial based on the

5    information that we obtain about them, Mr. Murphy can make

6    what are called challenges for cause, which are just

7    objections that say, Judge, this person is not going to be

8    fair and impartial; they should not be permitted to sit as a

9    juror in this case.  And if I agree, then that person would be

10   struck from the jury pool and would not be permitted to be on

11   the jury in this case.  That's called a challenge for cause.

12           Do you understand that?

13   A.  Yes, your Honor.

14   Q.  The other thing to understand about the -- about

15   challenges for cause is there's no limit to the number that

16   you can make.  As many people as you and Mr. Murphy might

17   object to, that's how many challenges you can make.  Now, odds

18   are that I won't agree with all of your challenges, but

19   there's no limit to the number you can make.

20           Do you understand that?

21   A.  Yes, I understand, your Honor.

22   Q.  All right.

23           Third, there's another kind of challenge you can

24   exercise in this case, and that's called a peremptory

25   challenge.  A peremptory challenge is more powerful than a

1    challenge for cause because I don't rule on peremptory

2    challenges.

3         On a peremptory challenge, you have the ability to

4    strike someone from the jury pool for almost any reason at

5    all.  The only reason you can't strike someone from the jury

6    with a peremptory challenge would be for an unconstitutional

7    reason.  For instance, you can't use peremptory challenges to

8    strike people based on their race or their religion, their

9    gender, categories like that.  But any other reason that you

10   might have, you can use your peremptory challenge to strike

11   people from the jury pool.

12        So, if someone came in to serve as a juror and you

13   just thought they had a bad attitude, they didn't want to

14   spend a week or two or a month, however long the trial would

15   take, sitting as a juror in the case -- they have something

16   important going on at work or maybe their spouse is in the

17   hospital or their daughter's getting married, whatever the

18   case may be -- if you think they're going to be distracted and

19   not be a good juror, you could use your peremptory challenges.

20        You could use your peremptory challenges to strike

21   people just because you don't like the way they're dressed or

22   you think they're too rich or too poor or too dumb or too

23   smart.  Anything but those unconstitutional reasons can serve

24   as the basis for a peremptory challenge?

25        Now, peremptory challenges I don't rule on.  So, they

1   are very -- they're much more powerful than challenges for

2   cause.  Because they're so powerful, you don't get an

3   unlimited number of peremptory challenges, but you would have

4   at least ten peremptory challenges to use in picking a jury in

5   this case.  So, if we brought in 40 people to select a jury of

6   12 from and you can strike ten of those people with peremptory

7   challenges for any reason at all, that's 25 percent of the

8   jury pool right there.  That's why I say the peremptory

9   challenges are very powerful.

10          Do you understand?

11  A.  I understand, your Honor.

12  Q.  Okay.

13          So, between questioning jurors, making challenges for

14  cause and exercising peremptory challenges, that's why I say

15  that you and Mr. Murphy will have a very big say in

16  determining who ultimately is selected to serve on the jury in

17  the case.

18          Do you understand that?

19  A.  Yes, your Honor.

20  Q.  Okay.

21          Now, once the jury's been selected, the lawyers make

22  their opening statements, and then because the government has

23  the burden of proof in the case, the government has to present

24  its evidence.  And it does that by calling witnesses or

25  presenting tangible items or documents into evidence.  There's

1    a couple things I want to make sure you understand about that

2    process.

3              First, the government doesn't get to necessarily show

4    or tell the jury everything it would like to.  It has to

5    proceed by rules of evidence and rules of procedure.  And if

6    Mr. Murphy believes that they're not following those rules, he

7    can make objections to the government's evidence.  And if I

8    agree with him, I would not permit the government to present

9    that evidence.  So, you have the right to challenge the

10   government's evidence.

11             Do you understand that?

12   A.  Yes, I understand, your Honor.

13   Q.  Okay.

14             And one of the most important ways that you can

15   challenge the government's evidence is through cross-

16   examination.  And cross-examination just means that you have

17   the right to question any of the witnesses that the government

18   calls to testify at trial.  It's not just the government that

19   gets to ask the questions.  Your attorney would have that

20   ability, too.

21             Do you understand that?

22   A.  Yes, I understand, your Honor.

23   Q.  Okay.

24             Now, once the government presents its evidence, as

25   the defendant in the case, you have the right, but not the

1    obligation, to present evidence yourself.  And I say the right

2    but not the obligation because it goes back to that very first

3    point I made.  You are presumed to be not guilty; therefore,

4    you have no burden of proof, and therefore you do not have to

5    present any evidence at all at the trial.  You don't have to

6    prove that you're not guilty.  The government has to prove

7    that you are guilty.

8           Do you understand that distinction?

9    A.  Yes, I understand, your Honor.

10   Q.  That said, if you and Mr. Murphy had evidence you wanted

11   to present to the jury that you thought would help convince

12   them that you're not guilty, you have the right to do that

13   under the same rules and procedures that the government

14   operates under.  So, you have the right to call witnesses.

15   You have the right to present exhibits into evidence and

16   things like that.

17          Do you understand that?

18   A.  Yes, I understand, your Honor.

19   Q.  Now, one of the types of evidence that you have the

20   ability to present, if you choose to do so, is your own

21   testimony.  If we went to trial, you would have the right to

22   testify if you wish to do so.  You also have the right not to

23   testify if you don't want to do so.  And the decision about

24   whether to testify or not is a decision that you alone get to

25   make.  It's not a decision that Mr. Murphy can make for you or

1    that the government makes for you or that the Court can make

2    for you.  It's your decision.

3           Mr. Murphy is an experienced, very competent criminal

4    defense attorney.  He would certainly give you the benefit of

5    his advice and expertise about whether it makes sense for you

6    to testify or not.  But at the end of the day, if you don't

7    like his advice on that matter, you don't have to listen to

8    it, because it's your decision, not his?

9           Do you understand that?

10   A.  Yes, I understand, your Honor.

11   Q.  All right.

12          Now, if you chose to testify at trial, the jury would

13   be instructed to consider your testimony in the same way that

14   it considers the testimony of any other witness who testifies

15   during the trial.  If you chose not to testify, however, the

16   jury would also be instructed that they could not hold that

17   decision against you.  And what I mean by that is the jurors

18   are told that they can't say to themselves, Mr. Kok must be

19   guilty; if he wasn't guilty, he would have taken an oath to

20   tell the truth, he would have gone on the witness stand and he

21   would have told us he's not guilty; since he didn't do that, I

22   think he's guilty.

23          The jurors can't indulge in those inferences.

24          Do you understand that?

25   A.  Yes, I understand, your Honor.

1  Q.  In fact, if you chose not to testify at trial, I would

2  instruct the jury that they cannot even mention the fact that

3  you chose not to testify when they're deliberating on a

4  verdict.

5       Do you understand?

6  A.  Yes, I understand, your Honor.

7  Q.  Okay.

8       Now, another point I want to make about what you can

9  present as evidence at trial is it's important to understand

10 that if you wanted to present evidence from a witness, for

11 example, but they weren't willing to come to trial

12 voluntarily, Mr. Murphy has the ability, just like the

13 government, to issue what are called trial subpoenas.  Those

14 are just court orders that require someone to come and present

15 their evidence at trial.  And I would enforce trial subpoenas

16 issued by Mr. Murphy in the same way that I enforce trial

17 subpoenas issued by the government.

18      So, you have the ability to compel witnesses to come

19 forward at the trial.

20      Do you understand that?

21 A.  Yes, I understand, your Honor.

22 Q.  Okay.

23      Now, once both sides had presented whatever evidence

24 they wanted to present, the lawyers make their closing

25 arguments, the judge instructs the jury about the law that

 1  applies in the case, and then the jurors go to the jury room

 2  to deliberate, meaning to discuss the evidence and the law,

 3  and to try to come to a verdict about whether that evidence

 4  proved the defendant guilty of any of the charges that had

 5  been brought against him.

 6         Couple of important things to understand about the

 7  jury verdict or a jury verdict.  In order for the jury to come

 8  back with a verdict, whether it's guilty or not guilty, they

 9  have to be unanimous in their view.  So, a guilty verdict --

10  in order for a guilty verdict to be returned, all 12 of the

11  jurors have to agree that the evidence proved the defendant

12  guilty beyond a reasonable doubt.  If even one juror is not

13  convinced beyond a reasonable doubt, the jury cannot return a

14  verdict.

15         Do you understand that?

16  A.  Yes, I understand, your Honor.

17  Q.  Now, if the jury comes back with a verdict, whether --

18  let's just say for the sake of discussion the jury came back

19  with a verdict of guilty, your rights would not be over even

20  at that point because you have the right -- you would have the

21  right to appeal the jury's verdict to a reviewing court, a

22  court of appeals.

23         Do you understand you have the right to appeal the

24  jury's verdict?

25  A.  Yes, I understand, your Honor.

1  Q.  And on appeal, you have the right to be represented again

2  by counsel and you have the right to go to the United States

3  Court of Appeals for the Seventh Circuit.  That's the

4  appellate court that sits in this courthouse in Chicago where

5  I'm located, and it reviews, among other cases, federal

6  criminal cases from Indiana, Illinois and Wisconsin.

7           And you have the right to go to the Seventh Circuit

8  with your attorney and make whatever arguments you may have

9  that there were errors made in your trial and that the errors

10 deprived you of a fair trial.  You may have arguments that the

11 judge made incorrect rulings or that the government did

12 something improper or just that the jury didn't have enough

13 evidence to find you guilty beyond a reasonable doubt.

14          Whatever your arguments, you can present them to the

15 Court of Appeals, and if they agree with you and they agree

16 that those errors were sufficient to deprive you of a fair

17 trial, you might be able to have a new trial.  Sometimes if

18 the errors are serious enough, the Court of Appeals might tell

19 the government you can't retry this individual, you have to

20 dismiss the charges against him.  Now, that doesn't happen

21 very often.

22          My point in telling you this is if we continue with

23 this process this afternoon and I accept your plea of guilty,

24 there's not going to be anything -- any trial errors to appeal

25 from because we're not going to have a trial, we're not going

1    to pick a jury, we're not going to present evidence.

2          Do you understand that?

3    A.  Yes, I understand, your Honor.

4    Q.  It's also important to understand that if we go forward

5    here and I accept your guilty plea and the plea agreement

6    that's been entered into, that you surrender not only trial

7    rights, but you surrender most of your appellate rights, as

8    well.

9          Do you understand that the plea agreement in this

10   case includes an appellate waiver if the government makes a

11   motion to lower your sentence based on cooperation that you've

12   provided; and, if the government makes that motion, you give

13   up your right to appeal basically anything other than the

14   voluntariness of your guilty plea or the effectiveness of your

15   counsel?

16         Do you understand you give up those appellate rights

17   here if we go forward and I conclude that you're guilty and I

18   accept the plea agreement that the parties have entered into?

19   Do you understand that?

20   A.  Yes, I understand, your Honor.

21   Q.  Okay.  That's a jury trial.  That's the jury trial

22   process.

23         There's another kind of trial that I have to talk to

24   you about briefly, and that's called a bench trial.  A bench

25   trial proceeds just like a jury trial with one big exception.

1    In a bench trial, we don't pick a jury to listen to the
2    evidence and render a verdict.   In a bench trial, the judge
3    does that rather than a jury.
4         Now, that's the big difference between a bench trial
5    and a jury trial.   Another difference to understand is that
6    you have an absolute right to a jury trial.   You don't even
7    have to ask for one.   You don't have a right to a bench trial.
8    You have the right to ask for a bench trial, but the
9    government could object to a bench trial or the Court could
10   object to a bench trial, in which case you would not be able
11   to have a bench trial.   But if you thought that's how you
12   wanted to resolve the charges against you, you do have the
13   right to make that request.
14        Do you understand the difference between a bench
15   trial and a jury trial?
16   A.   Yes, your Honor.
17   Q.   I understand that the parties have reached a plea
18   agreement.   Do you have a copy of the plea agreement there
19   with you, Mr. Kok?
20   A.   Yes, I do.   Let me get it.
21   Q.   Okay.
22        Do you have it there in front of you now?
23   A.   Can I just go off and pick it up?
24   Q.   Sure.   Yes, please.
25   A.   Okay.   Thank you.

1      (Brief pause.)

2         THE DEFENDANT:  Okay.  Sorry about that, your Honor.

3 I've got the plea agreement.

4         THE COURT:  That's all right.

5 BY THE COURT:

6 Q.  Would you look at the last page of that plea agreement,

7 please.  And does that page bear your signature?

8 A.  Yes, it does, your Honor.

9 Q.  And that's your signature above your typewritten name?

10 A.  Yes, it is, your Honor.

11 Q.  All right.

12         Now, did you read this document before you signed it?

13 A.  Yes, I did, your Honor.

14 Q.  And did you have enough time to discuss it with Mr.

15 Murphy?

16 A.  Yes, your Honor.

17 Q.  Did you sign this plea agreement voluntarily?

18 A.  Yes, I did, your Honor.

19 Q.  Did anyone force you or coerce you in any way to sign this

20 plea agreement?

21 A.  No, your Honor.

22 Q.  You understand that this plea agreement is basically a

23 contract between you and the government?  You promise to do

24 certain things and, in exchange, the government promises to do

25 certain things.  Do you understand that's the nature of the

1   plea agreement?

2   A.  Yes, your Honor.

3   Q.  Other than any promises that are included in the plea

4   agreement, has anyone promised you anything in order to induce

5   you or entice you to sign the plea agreement?

6   A.  No, your Honor.

7   Q.  And you understand that in this plea agreement, you are

8   agreeing to enter a voluntary plea of guilty to Count 1 of the

9   indictment in this case, which charges you with conspiring to

10  steal trade secrets, in violation of Title 18 of the United

11  States Code, Section 1832(a)(5)?

12          Do you understand that's the charge that you will be

13  convicted of if I accept your plea of guilty?

14  A.  Yes, your Honor.

15  Q.  All right.

16          Do you understand that someone who is convicted of

17  that charge could be sentenced up to ten years of

18  imprisonment, fined up to $250,000 or twice the gross gain or

19  gross loss resulting from the offense, whichever is greater,

20  and a term of what's called supervised release can be imposed

21  of up to three years.  In addition, the Court would be

22  required to impose what's called a special assessment of $100?

23  Collectively, those comprise the maximum penalties that can be

24  imposed in this case.

25          Do you understand that?

1   A.  Yes, I do, your Honor.

2   Q.  Now, those are the maximum penalties.  They're not

3   necessarily the penalties that will be imposed.

4        You understand that you're not going to be sentenced

5   today, correct?

6   A.  Yes, I understand, your Honor.

7   Q.  And that's because I don't have the necessary information

8   to sentence you, to determine the appropriate sentence to

9   impose.  And we won't have that in this case for a number of

10  months because, number one, I need background information

11  about you that I get through the preparation of what's called

12  a Presentence Investigation Report.  That's a report prepared

13  by the Probation Department of the court.  And it gives me

14  information about your background, your education, your

15  health, your financial situation, gives me more background

16  about the offense that you committed, and it provides

17  preliminary calculations of the advisory Sentencing Guideline

18  range that applies in the case.

19       Once I have all of that information, it's likely --

20  and counsel can correct me if I'm making an unwarranted

21  assumption here, but it's likely that sentencing in this case

22  would be deferred further until your cooperation with the

23  government has reached, if not an endpoint, a point where it

24  makes sense to go forward with the sentencing.  So, it will be

25  some period of time -- months, perhaps longer -- before you're

1    actually sentenced in this case.

2           Do you understand that?

3    A.  Yes, your Honor.

4    Q.  Okay.

5           Now, one of the pieces of information that I need

6    before sentencing is a preliminary calculation of the advisory

7    Sentencing Guideline range that applies in the case.  Have you

8    had a chance to talk with Mr. Murphy about the Sentencing

9    Guidelines and the role that they play in sentencing?

10   A.  I do.

11   Q.  All right.

12          A couple things I want to make sure you understand

13   about the Sentencing Guidelines.  First, they're called the

14   Sentencing Guidelines because that's what they are.  They are

15   guidelines.  They're not binding on the Court.  I'm required

16   to calculate what the Guidelines suggest that the sentence

17   that is appropriate in this case, but I have the discretion to

18   conclude that the Guideline sentence is not the appropriate

19   sentence for many reasons and that, therefore, a sentence

20   other than the Guidelines suggest may be appropriate.  And,

21   ultimately, I have the discretion to sentence you within the

22   Guideline range, below that range or above that range, all the

23   way up to those maximum penalties that we just talked about.

24          Do you understand that the Court has that discretion?

25   A.  I understand, your Honor.

1    Q.   Okay.

2            Understanding that, I want to make sure that you have

3    some sense of what the Guideline range in this case may be.

4    I'm going to ask the lawyers what their preliminary views of

5    the Guidelines are because I'm required to consider the

6    Guidelines, and their discussions and thought is the best

7    information we have right now about what the Guidelines are

8    likely to be.

9            THE COURT:  Government, what's your preliminary

10   calculation of the Guideline range?

11           MS. WELLS:  Your Honor, our preliminary calculation

12   is that there would be an Offense Level -- an Adjusted Offense

13   Level -- of 37.  And the Guideline calculation is detailed on

14   Page 10 of the plea agreement.  Combined with an anticipated

15   Criminal History Category of I, that would result in an

16   advisory Guidelines range of 210 to 262 months of

17   imprisonment.  However, pursuant to Guideline 5G1.1(a),

18   because the statutory maximum sentence is less than that

19   Guidelines range, the Guideline sentence is the statutory

20   maximum of 120 months in prison.

21           THE COURT:  All right.

22           Mr. Murphy, do you anticipate any disputes about the

23   calculation of the Guideline range at this point?

24           MR. MURPHY:  That's my understanding at this time,

25   Judge.

```
 1              THE COURT:  All right.
 2    BY THE COURT:
 3    Q.  So, right now, Mr. Kok, Mr. Murphy agrees with the
 4    government that when you apply the rules that are set forth in
 5    the Guidelines, the suggested sentence is going to actually be
 6    lower than what the Guidelines would suggest but for the
 7    maximum penalty that can be imposed.  As we discussed, there's
 8    a ten-year maximum penalty that can be imposed based on a
 9    conviction on Count 1.  The Guideline range would be higher
10    but for that maximum penalty.  So, in this case, the Guideline
11    range, the parties believe, is going to be the maximum penalty
12    under the law, which is ten years of imprisonment.
13              Do you understand that?
14    A.  Yes, I understand, your Honor.
15    Q.  Now, do you also understand that -- never mind.
16              I don't have the discretion to go above that because
17    that's the statutory maximum.  I do have the discretion to go
18    lower than that, though.
19              Now, the penalties that are imposed in this case, Mr.
20    Kok, or the sentence that's imposed is obviously the most
21    significant consequence of being found guilty of this charge,
22    but it's not the only consequence.  By that, I mean that the
23    law imposes restrictions and requirements on people who have
24    been convicted of felony convictions -- felony offenses.  And
25    this is a felony offense, Count 1 of the indictment.
```

1          The law imposes various restrictions on people who
2     have been convicted of felonies.  Common examples are that one
3     can't possess a firearm in most jurisdictions if you have been
4     convicted of a felony.  You can't vote in many jurisdictions
5     if you've been convicted of a felony.  You can't run for
6     office if you've been convicted of a felony.  In federal
7     court, you can't sit as a juror in a federal criminal case if
8     you've been convicted of a felony.

9          There are many, many restrictions like that that are
10    imposed on people who have been convicted of felonies.  There
11    are too many for me to list them all for you, and they change
12    and vary from place to place and jurisdiction to jurisdiction.
13    So, I can't possibly warn you about all of them.  If you have
14    any concerns about those kinds of things, that's something
15    that you need to discuss with your attorney before pleading
16    guilty.  Because if you wait until after you've pled guilty to
17    come back and say, Judge, I didn't know I was going to lose
18    this right or that right, I'd like to withdraw my guilty plea,
19    it's going to be too late for that.

20         Do you understand that?
21    A.  Yes, your Honor.
22    Q.  All right.

23         I also want to make particularly clear that folks who
24    are not United States citizens very likely for -- after being
25    convicted of this crime, very likely would face deportation

1    proceedings from the United States.  So, if that's a concern

2    of yours, that's something, again, that you have to give

3    thought to before you plead guilty rather than afterwards.

4             Do you understand?

5    A.   Yes, I understand, your Honor.

6    Q.   Would you turn -- take that plea agreement, again, Mr.

7    Kok, and turn to Page 2.  And do you see about a third of the

8    way down that page, there's a heading that's underlined that

9    says, "Factual Basis."

10            Are you with me there?

11   A.   Factual basis, yes.

12   Q.   On Page 2?

13   A.   Yes.

14   Q.   That factual basis in the plea agreement continues for a

15   number of pages all the way to about the middle of Page 8.

16            Now, when you signed the plea agreement, did you

17   understand that that factual basis is essentially a written

18   confession as to why you're guilty of the charge set forth in

19   Count 1 of the indictment?

20   A.   Yes, your Honor.

21   Q.   Understanding that's the nature of that portion of the

22   plea agreement, did you read it very carefully?

23   A.   Yes, your Honor.

24   Q.   And were you satisfied that that factual basis set forth

25   in the plea agreement was completely 100 percent accurate when

1   you signed that plea agreement?

2   A.  Yes, your Honor.

3   Q.  Do you continue to this present time to believe that the

4   factual basis in the plea agreement is completely 100 percent

5   accurate?

6   A.  Yes, your Honor.

7   Q.  All right.

8          When your attorney was negotiating the plea agreement

9   with the government, did you have the opportunity to review

10  earlier drafts of the factual basis?

11  A.  Yes, I did, your Honor.

12  Q.  Did you understand that if you felt something was not

13  accurate or correct in that draft, that it should be corrected

14  and the error should be pointed out?

15  A.  Yes, I did, your Honor.

16  Q.  Did you make any such corrections to earlier drafts?

17  A.  No, your Honor.

18  Q.  All right.

19         Is that because you were satisfied that all along the

20  factual basis has been completely accurate?

21  A.  Yes, your Honor.

22  Q.  All right.

23         THE COURT:  Understanding -- either Ms. Wells or

24  Mr. Dollear, understanding that Mr. Kok has affirmed the

25  accuracy of the detailed factual basis set forth in the plea

1   agreement, I'll ask one of you to summarize what the evidence

2   at trial would be, summarize being the operative word here.

3   BY THE COURT:

4   Q.  And, Mr. Kok, I'm going to ask you to listen closely to

5   the prosecutor.  They're going to tell me if this case went to

6   trial what their evidence would show.  And when they're

7   finished, I'm going to ask you whether you disagree with

8   anything that they've told me.  All right?

9   A.  Okay.

10           THE COURT:  Ms. Wells?

11           MS. WELLS:  Yes, your Honor, I'll proceed.

12           As the Court noted, there is a detailed factual basis

13  contained in Paragraph 6 of the plea agreement that has been

14  reviewed and signed by the defendant.  In summary, the

15  government's evidence would show that beginning on or around

16  June 8, 2007, and continuing until at least on or about June

17  22nd, 2020, the defendant, along with others, including the

18  other named defendants in this case, conspired to and did

19  steal trade secrets from the named victim Motorola.

20           Defendant and others worked for a company called

21  Hytera, which was headquartered in China.  Motorola

22  Solutions, Inc., was a telecommunications company

23  headquartered in Illinois with offices around the world.  As

24  the defendant has acknowledged in the factual basis, he was

25  aware that hundreds of Motorola employees had spent a number

 1   of years developing digital mobile radio technology for

 2   Motorola.  He also knew that by approximately 2007, Motorola

 3   was offering those digital mobile radios or DMRs for sale to

 4   the public.

 5        By at least June 2007, an executive at Hytera, noted

 6   as Executive 1 in the plea agreement, had begun to recruit the

 7   defendant to leave Motorola and to start working for Hytera in

 8   China.  During that recruitment, Executive 1 and the defendant

 9   met in person many times.  At the time of his recruitment to

10   Hytera, defendant was a senior engineering manager responsible

11   for DMR products at Motorola.

12        On occasion, Executive 1 told the defendant that he

13   wanted to develop Hytera's DMR products in two years.  The

14   defendant believed that it would take several more years to

15   develop a product like Motorola's, but Executive 1 instructed

16   him to develop the technology faster.  The defendant -- excuse

17   me.  Executive 1 requested, and the defendant agreed, that

18   they would steal Motorola's DMR technology.  To accomplish

19   that, the defendant recruited several Motorola employees and

20   told them to steal Motorola trade secrets, including

21   proprietary source code related to DMR.

22        The defendant began working at Hytera in 2008.  He

23   earned a higher salary and purchased stock options.  He earned

24   approximately -- he earned over $1 million during his

25   employment at Hytera.  He was eventually made a member of

1  Hytera's Board of Directors.

2       Among the employees recruited by the defendant were

3  the other named defendants in this case.  In part, because of

4  the defendant's instructions, co-defendants, including Yih

5  Tzye Kok, Sam Chia, Wong, Hoong, and Chua, accessed and copied

6  confidential proprietary and trade secret Motorola information

7  and provided -- those co-defendants provided information from

8  Motorola to Hytera without the victim's knowledge or consent.

9       The defendant acknowledges that when defendants

10 accessed Motorola documents from Malaysia, those requests were

11 routed through servers in the Northern District of Illinois,

12 and that other technical aspects of that routing took place in

13 the United States.

14      As instructed by Executive 1, the defendant told his

15 co-defendant Sam Chia that he should take as much information

16 as he could take from Motorola, including everything related

17 to DMR, and that Chia, the co-defendant, along with others,

18 stole proprietary Motorola DMR information, including the

19 source code.

20      Co-defendant Ooi was recruited by co-defendant Yih

21 Tzye Kok to serve as a software development project manager.

22 While at Motorola, the defendant supervised Wong, Hoong and

23 Chua, all co-defendants in the case.  They were selected

24 because of their particular expertise related to DMR and

25 related technology.

 1              As a result of Executive 1's instruction and

 2    defendant's efforts and efforts of other Hytera employees,

 3    Hytera's DMR technology used source code stolen from Motorola.

 4    The defendant was aware that Hytera marketed and sold its DMR

 5    which relied on that stolen technology around the world.  And

 6    the defendant acknowledges that that Hytera DMR product was

 7    sold in the Northern District of Illinois at least as recently

 8    as November 2019.

 9              The defendant also knew that certain information

10    stolen from Motorola and used by Hytera included Motorola

11    trade secrets.  And he acknowledges that certain stolen

12    information from Motorola were trade secrets because Motorola

13    had taken reasonable security measures, both physical and

14    cyber related, to keep that information secret.

15              Based on the stolen trade secrets, Hytera was able to

16    develop a DMR product by 2010.  Defendant acknowledges that

17    the theft of trade secrets from Motorola caused at least

18    $252,100,000 in pecuniary damage to Motorola in the form of

19    lost profits.

20              In September of 2017, the defendant testified in a

21    deposition in connection with a civil lawsuit between Motorola

22    and Hytera, and he acknowledges during the deposition and

23    under oath he provided materially false testimony.

24              And, your Honor, that is, as you said, a summary of

25    the factual basis, but I'll stop there unless the Court has

1   any other questions.

2   BY THE COURT:

3   Q.  Mr. Kok, do you disagree with any of the statements that

4   Ms. Wells just provided to the Court?

5   A.  No, your Honor.

6   Q.  So, from at least this 13-year period from 2007 to -- more

7   than 13 years.  17 years, excuse me.  I can't subtract.

8           During this approximately 17-year period, that you

9   schemed with others to steal trade secrets of Motorola

10  Corporation to advance the interests of Hytera?

11  A.  2007 to 2017.  Ten years.

12  Q.  Ten years.  I told you I'm not good at math.

13          So, over that period do you agree you worked with the

14  co-defendants who are named in this case to steal trade

15  secrets from Motorola and provide them to Hytera?

16  A.  Yes, I did, your Honor.

17          THE COURT:  Based on the detailed factual stipulation

18  that is set forth in the plea agreement, the accuracy of which

19  Mr. Kok has confirmed under oath; based on the government's

20  proffer of what its evidence at trial would show, the accuracy

21  of which Mr. Kok has confirmed under oath, as well; and, based

22  on his responses under oath to the Court's questions, I find

23  that there is a factual basis to support a plea of guilty to

24  Count 1 of the indictment in this case.

25  BY THE COURT:

```
 1   Q.  The last thing I need to cover with you, Mr. Kok, is --
 2   and I asked you some of these questions already with respect
 3   to signing the plea agreement.  But now I'm asking you more
 4   broadly about your decision to plead guilty.  Has anyone
 5   forced you in any way to plead guilty to this charge?
 6   A.  No, your Honor.
 7   Q.  Has anyone threatened you in any way to cause you to plead
 8   guilty to this charge?
 9   A.  No, your Honor.
10   Q.  Other than the plea agreement, have any promises been made
11   to you to induce you or entice you to plead guilty?
12   A.  No, your Honor.
13   Q.  Has anyone promised you what your sentence in this case
14   will be if you plead guilty?
15   A.  No, your Honor.
16   Q.  You understand that ultimately the sentence that is
17   imposed in this case is a determination that I will make, it's
18   not a determination that is dictated by your plea agreement.
19           Do you understand that?
20   A.  Yes, I understand, your Honor.
21   Q.  Is your decision to plead guilty entirely voluntary?
22   A.  Yes, it is, your Honor.
23   Q.  Is it a decision that you have reached because you have
24   decided it is in your own best interest to plead guilty?
25   A.  Yes, your Honor.
```

1  Q.  Is it a decision you've reached because you are, in fact,

2  guilty of the charge set forth in Count 1 of the indictment?

3  A.  Yes, your Honor.

4  Q.  All right.

5       Then the next question I'm going to ask you, Mr. Kok,

6  is how you wish to plead to Count 1 of the indictment in this

7  case.  If you tell me that you wish to plead guilty, I'm going

8  to accept your plea of guilty, and you will at that point be

9  adjudged guilty and it will be just like you had a trial and

10 the jury came back with a verdict of guilty.  In other words,

11 that's the point of no return.

12       Do you understand that?

13 A.  Yes, I understand, your Honor.

14 Q.  Understanding that, Mr. Kok, how do you wish to plead to

15 Count 1 of the indictment in this case?

16 A.  Guilty, your Honor.

17       THE COURT:  Since you acknowledge that you are, in

18 fact, guilty as charged in Count 1, you had the assistance of

19 counsel, you've been advised of your trial rights, we've

20 talked about the sentencing process, the maximum possible

21 punishment that can be imposed, the role that the Sentencing

22 Guidelines play and you have acknowledged that you are freely

23 and voluntarily pleading guilty, I accept your plea of guilty

24 and I enter a finding of guilty on your plea as to Count 1 of

25 the indictment.

```
 1              All right.  Ordinarily, the next step in this process

 2    is the preparation of a Presentence Investigation Report.

 3    Does that make sense to start that at this point, counsel, or

 4    defer that process?

 5              MR. MURPHY:  Judge --

 6              MS. WELLS:  Your Honor, I would --

 7              MR. MURPHY:  I'm sorry.  Go ahead, Melody.

 8              MS. WELLS:  Your Honor, I would --

 9              MR. MURPHY:  Go ahead.

10              MS. WELLS:  I would suggest deferring it, your Honor,

11    but if Mr. Murphy feels otherwise, he can say so.

12              MR. MURPHY:  No, I'm in total agreement.  Deferring

13    makes a lot of sense, Judge.

14              THE COURT:  All right.

15              Then why don't we set -- I think we are safe in

16    setting a status, say, six months out.  I don't think things

17    are going to be materially resolved by that point.

18              Does that make sense?

19              MS. WELLS:  Yes.

20              MR. MURPHY:  Yes, Judge.

21              THE COURT:  We'll pick a date.

22              Alberta, are you still on?

23              THE CLERK:  Yes, I am.

24              THE COURT:  Can you give us a date in --

25              THE CLERK:  In June?
```

```
1               THE COURT:  Yes.  Maybe the 5th or 6th of June.
2               THE CLERK:  June 5th at 2:30 p.m.
3               THE COURT:  Is that convenient for counsel?
4               MS. WELLS:  It is for the government, your Honor.
5               MR. MURPHY:  Yes, Judge.
6               THE COURT:  All right.
7               I assume there's no dispute that Mr. Kok should
8       remain on bond pending sentencing?
9               MS. WELLS:  That's correct.
10              MR. MURPHY:  That's correct, Judge.
11              THE COURT:  Mr. Kok, you're going to remain on bond,
12      subject to the pretrial conditions that have been imposed in
13      this case, pending sentencing.  It's even more important now
14      that you continue to abide by all your conditions of bond.
15      Were you not to do that, not only might your bond be revoked,
16      but the fact that you're ultimately not able to self-surrender
17      to serve any prison sentence could adversely affect your
18      designation in the Bureau of Prisons and result in assignment
19      to a harsher institution than would otherwise be warranted.
20      So, it's more important than ever to abide by all your
21      conditions of release.
22              Do you understand?
23              THE DEFENDANT:  I understand, your Honor.
24              THE COURT:  Okay.
25              Anything else we need to do today, counsel?
```

1          MR. MURPHY:  I think we're good to go, Judge.

2          THE COURT:  All right.  Thank you.  We'll convene in

3     early June.  We're adjourned.

4          MR. MURPHY:  Thank you, Judge.

5          THE DEFENDANT:  May I say something, Judge?

6          THE COURT:  Yes, Mr. Kok.

7          THE DEFENDANT:  Thank you for accommodating remote

8     change of plea.  It helped me to -- my family life as normal

9     as possible, and I truly appreciate that.

10          THE COURT:  You're welcome.

11          All right.  Thank you, all.  We're adjourned.

12          MR. MURPHY:  Thank you.

13          THE DEFENDANT:  Thank you.

14                    *     *     *     *     *

15

16    I certify that the foregoing is a correct transcript from the
      record of proceedings in the above-entitled matter.
17

18
      /s/ Joseph Rickhoff                    December 5, 2022
19    Official Court Reporter

20

21

22

23

24

25