# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

UNITED STATES OF AMERICA

                Plaintiff,

v.

HYTERA COMMUNICATIONS
CORPORATION LTD., et al.

                Defendants.

Case No. 1:20-CR-00688

Honorable John J. Tharp Jr.

█████████████████████

# DEFENDANT HYTERA COMMUNICATIONS CORPORATION LTD.'S
# SENTENCING MEMORANDUM

I.    Introduction............................................................................................................ 1

II.   Factual Background ................................................................................................ 3

    A.   The Theft........................................................................................................ 3

    B.   The Asserted Motive ..................................................................................... 4

    C.   The Civil Litigation....................................................................................... 6

        1.   The Civil Trial....................................................................................... 6

        2.   Post-Judgment....................................................................................... 8

III.  The Government Has Failed to Prove Essential Facts........................................ 12

    A.   Sentencing Implicates Four Related-But-Distinct Legal Inquiries ................ 12

        1.   Statutory Maximum Fine Under 18 U.S.C. § 1832(b)................................ 12

        2.   Statutory Maximum Fine Under 18 U.S.C. § 3571(d)............................... 13

        3.   Base Fine Under Chapter 8 of the Guidelines ......................................... 13

        4.   Restitution Under the MVRA ................................................................. 13

    B.   The Government Has Not Attempted to Define—and Hytera Has Not Admitted—What the Trade Secrets Are ................................................................................. 13

    C.   Motorola's Efforts to Satisfy the Government's Burden Fail As Well ........... 16

        1.   Motorola's Latest Attempt to Define its Trade Secrets ............................. 16

        2.   Motorola's False Claims About the Civil Jury's Verdict .......................... 17

    D.   The Government Has Not and Cannot Establish the Gains or Losses Caused by the Theft of Undefined Trade Secrets .................................................................. 19

    E.   Even Accepting Malackowski's Market Share Methodology, the Resulting Calculation Is Wrong ................................................................................................ 23

    F.   The Government Has Not Proven What Hytera's Gains Were ....................... 23

IV.  Objections to the PSR ........................................................................................ 24

    A.   Correction to the PSR's Statutory Maximum Fine Calculation...................... 24

    B.   Contrary to Paragraph 132 of the PSR, Imposing a Fine Greater Than $5 Million Would Violate the Ex Post Facto Clause ...................................................... 26

    C.   Corrections to the PSR's Guidelines Calculations........................................ 28

        1.   "Pecuniary Gain" Under the Guidelines Cannot Be Based on the Unjust Enrichment Award in the Civil Case .......................................................................... 28

        2.   The PSR's Obstruction of Justice Enhancement to Hytera's Culpability Score Is Inappropriate ........................................................................................ 30

        3.   There Is No Evidence that Hytera's Former CEO Participated in, Condoned, or Was Willfully Ignorant of the Offense ........................................................... 32

    D.   The Guidelines Fine Range Should Be $98,000 to $196,000........................ 33

1.    Attempting to Use Motorola's Lost Profits as the Base Fine Amount Implicates the Complexity Exception to U.S.S.G. § 8C2.4(c) ................................................ 33

2.    Attempting to Use Hytera's Gain as the Base Fine Amount Would Also Implicate the Complexity Exception ................................................ 34

3.    Under U.S.S.G. § 8C2.4(a)(1), the Base Fine Amount Is $70,000 .............................. 35

4.    Hytera's Correct Culpability Score is 7 ................................................ 36

5.    Hytera's Fine Range Is $98,000 to $196,000 ................................................ 37

V.    Application of the 18 U.S.C. § 3553 Sentencing Factors ................................................ 37

A.    History and Characteristics of the Defendant (Section 3553 (a)(1)) ................................ 37

B.    Protecting The Public from Further Crimes of the Defendant (Section 3553(a)(2)(C))... 38

C.    Need to Avoid Unwarranted Sentence Disparities (Section 3553(a)(6)) .......................... 39

D.    Affording Adequate Deterrence to Criminal Conduct (Section 3553(a)(2)(B)) ............... 40

E.    Need to Provide Restitution (Section 3553(a)(7)) ................................................ 40

F.    Seriousness of the Offense, Respect for the Law, and Providing Just Punishment (Section 3553(a)(2)(A)) ................................................ 41

VI.    Motorola Is Not Entitled to Restitution ................................................ 41

A.    The MVRA's Complexity Exception Applies ................................................ 42

B.    Lost Profits Are Not Available as Restitution for Property Offenses Under the MVRA. 43

VII.    Hytera Should Not Be Ordered to Pay Financial Obligations Beyond Its Ability to Pay 45

A.    The Court Must Consider Hytera's Ability to Pay in Setting Any Fine .......................... 45

B.    Hytera Cannot Promise to Pay More Than ███████████ to Motorola ................ 45

C.    The Court Must Consider Hytera's Ability to Pay in Setting a Payment Schedule ......... 47

D.    The Court Should Consider Hytera's Ability to Pay in Determining Whether to Impose Interest ................................................ 48

VIII.    Motorola's Five Proposed Special Conditions of Probation Should Be Rejected. ........... 48

A.    Motorola's Requested Conditions Are Plainly Self-Interested ......................................... 50

B.    There is No Agreed Definition of Motorola's Trade Secrets ......................................... 51

C.    Hytera Has Already Implemented Measures to Identify and Quarantine Motorola's Confidential Information. ................................................ 52

D.    Motorola's Request for Judicial Oversight Over All New Hytera Products Is Unjustified. 52

E.    Motorola's Request for Negative Publicity About Its Largest Competitor Is Unjustified 54

F.    Motorola's Anti-Sale Injunction Is Unjustified and Duplicative ..................................... 55

G.    Motorola's Request for a Compliance Monitor Should Be Denied ................................. 55

1.    Motorola's "Additional Measures" Are a Thinly Veiled Request for a Compliance Monitor ................................................ 56

2.    Hytera Has Developed an Effective Compliance Program That Is Far More Robust Than the One in Place in 2008 ............................................................................................ 57

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Composite Marine Propellers, Inc. v. Van Der Woude*,
  962 F.2d 1263 (7th Cir. 1992) ...........................................................................20, 21

*Esteras v. United States*,
  145 S. Ct. 2031 (2025)........................................................................................50

*Euroholdings Cap. & Inv. Corp. v. Harris Tr. & Sav. Bank*,
  602 F. Supp. 2d 928 (N.D. Ill. 2009) ................................................................19

*Gold Medal Prods. Co. v. Bell Flavors & Fragrances Inc.*,
  No. 1:17-CV-4084, 2018 WL 1135629 (N.D. Ill. Mar. 2, 2018) ......................20

*Grain Processing Corp. v. Am. Maize-Prods. Co.*,
  185 F.3d 1341 (Fed. Cir. 1999)....................................................................20, 21

*Grunewald v. United States*,
  353 U.S. 391 (1957)............................................................................................26

*Hunter Bldgs. & Mfg., L.P. v. MBI Glob., L.L.C.*,
  436 S.W.3d 9 (Tex. App. 2014) .........................................................................20

*In re HCA West, Inc.*,
  Case No. 8:20-bk-11507 (C.D. Cal. Bkr. filed May 26, 2020)...........................9

*In re Hytera America, Inc.*,
  Case No. 8:20-bk-11509 (C.D. Cal. Bkr. filed May 26, 2020)...........................9

*Life Spine, Inc. v. Aegis Spine, Inc.*,
  8 F.4th 531,540–41 (7th Cir. 2021) ...................................................................16

*Mangren Rsch. & Dev. Corp. v. Nat'l Chem. Co.*,
  87 F.3d 937 (7th Cir. 1996) ....................................................................19, 20, 21

*Midwest Grinding Co. v. Spitz*,
  976 F.2d 1016 (7th Cir. 1992) ...........................................................................26

*Motorola Sols., Inc. v. Hytera Commc'ns Corp. Ltd.*,
  108 F.4th 458 (7th Cir. 2024) ...................................................................*passim*

i

*OCI Wyoming, L.P. v. PacifiCorp*
    479 F.3d 1199 (10th Cir. 2007) ...................................................................8, 19

*Price v. Marshall Erdman & Assocs., Inc.*,
    966 F.2d 320 (7th Cir. 1992) .....................................................................8, 19

*TAS Distrib. Co., Inc. v. Cummins Engine Co., Inc.*,
    491 F.3d 625 (7th Cir. 2007) .........................................................................19

*United States v. Arvanitis*,
    902 F.2d 489 (7th Cir. 1990) .........................................................................44

*United States v. Betts*,
    99 F.4th 1048 (7th Cir. 2024) ............................................................19, 42, 44

*United States v. BP Prods. N. Am. Inc.*,
    610 F. Supp. 2d 655 (S.D. Tex. 2009) (Rosenthal, J.) .....................................28, 34

*United States v. Bros. Const. Co. of Ohio*,
    219 F.3d 300 (4th Cir. 2000) .........................................................................31

*United States v. Buchanan*,
    Nos. 22-3301/3697, 2023 WL 5352223 (6th Cir. Aug. 21, 2023).........................44

*United States v. CITGO Petroleum Corp.*,
    908 F. Supp. 2d 812 (S.D. Tex. 2012) ............................................................34

*United States v. Couch*,
    28 F.3d 711 (7th Cir. 1994) ..........................................................................26

*United States v. Farmer*,
    755 F.3d 849 (7th Cir. 2014) .........................................................................52

*United States v. Galbraith*,
    20 F.3d 1054 (10th Cir. 1994) .......................................................................29

*United States v. Gallant*,
    537 F.3d 1202 (10th Cir. 2008) .....................................................................42

*United States v. Gibson*,
    409 F.3d 325 (6th Cir. 2005) ....................................................................32, 34

*United States v. Kolon Indus.*,
    No. 3:12-CR-00137-001 (E.D. Va., May 1, 2015), Dkt. 196 ................................40

*United States v. Malone*,
    747 F.3d 481 (7th Cir. 2014) .........................................................................42

*United States v. McCormack*,
 152 F.4th 428 (3d Cir. 2025) ........................................................44

*United States v. Mitchell*,
 876 F.2d 1178 (5th Cir. 1989) .......................................................44

*United States v. Oslund*,
 453 F.3d 1048 (8th Cir. 2006) ...................................................42, 43

*United States v. Paulette*,
 858 F.3d 1055 (7th Cir. 2017) .......................................................27

*United States v. Randle*,
 324 F.3d 550 ..................................................................................44

*United States v. Reifler*,
 446 F.3d 65 (2d Cir. 2006)............................................................43

*United States v. Rutley*,
 482 F. App'x 175 (7th Cir. 2012) .................................................44

*United States v. Sanford Ltd.*,
 878 F. Supp. 2d 137 (D.D.C. 2012)...........................................28, 35

*United States v. Scott*,
 405 F.3d 615 (7th Cir. 2005) .........................................................44

*United States v. Serawop*,
 505 F.3d 1112 (10th Cir. 2007) .....................................................42

*United States v. Sharp*,
 927 F.2d 170 (4th Cir. 1991) .........................................................44

*United States v. Shepard*,
 269 F.3d 884 (7th Cir. 2001) .........................................................44

*United States v. Siemens Energy, Inc.*,
 No. 3:24-cr-00141 (E.D. Va., Dec. 5, 2025), Dkt. 24...................40

*United States v. Sinovel Wind Grp.*,
 No. 3:13-CR-00084 (W.D. Wisc., July 6, 2018), Dkt. 497 ..........40

*United States v. Steele*,
 897 F.3d 606 (4th Cir. 2018) .........................................................41

*United States v. United Microelectronics Corp.*,
 No. 18-CR-465 (N.D. Cal., Oct. 28, 2020), Dkt. 150...................40

**Statutes**

11 U.S.C. § 1112(b) ............................................................................................9

18 U.S.C. § 1832 .........................................................................................14, 41

18 U.S.C. § 1832(a)(5) ....................................................................................26

18 U.S.C. §1832(b) .............................................................................2, 12, 26

18 U.S.C. § 1839(3)(B) ....................................................................................53

18 U.S.C. § 1839(5) ..........................................................................................25

18 U.S.C. § 1839(6)(B) ....................................................................................53

18 U.S.C. § 2323(c) ..........................................................................................43

18 U.S.C. § 3553 ...............................................................................................37

18 U.S.C. § 3553(a) ..........................................................................................37

18 U.S.C. § 3553(a)(2) ...............................................................................2, 49

18 U.S.C. § 3553(b)(5) .....................................................................................52

18 U.S.C. § 3563(b) ....................................................................................49, 54

18 U.S.C. § 3563(b)(5) .....................................................................................52

18 U.S.C. § 3571(d) ............................................................13, 28, 34, 35

18 U.S.C. § 3572(b) ..........................................................................................45

18 U.S.C. § 3572(d)(1) .....................................................................................47

18 U.S.C. § 3572(d)(2) .....................................................................................47

18 U.S.C. § 3612(f) ...........................................................................................48

18 U.S.C. § 3663A(b)(1) .............................................................................13, 44

18 U.S.C. § 3663A(b)(2) ..................................................................................44

18 U.S.C. § 3663A(c)(3)(B) .......................................................................41, 42

Alternative Fines Act (18 U.S.C. § 3571) .........................................................12

Copyright Act .............................................................................................7, 10, 29

Defend Trade Secrets Act of 2016, Pub. L. No. 114-153, § 3, 130 Stat. 376, 382....................7, 26

U.S.S.G. 8D1.3(c)............................................................................................................49

U.S.S.G. § 2B1.1(a)(2).....................................................................................................35

U.S.S.G. § 2B1.1(b)(1)(B)................................................................................................29

U.S.S.G. § 2B1.1(b)(1)(C)(i)............................................................................................29

U.S.S.G. § 2B1.1(b)(10)(B)..............................................................................................36

U.S.S.G. § 3C1.1.........................................................................................................31, 32

U.S.S.G. § 5E1.1(b)(2)(B)................................................................................................41

U.S.S.G. § 8A1.2 ..........................................................................................28, 34, 35, 36

U.S.S.G. § 8C2.4........................................................................................................13, 34

U.S.S.G. § 8C2.4(a) ..........................................................................................................13

U.S.S.G. § 8C2.4(a)(1)......................................................................................................35

U.S.S.G. § 8C2.4(a)(2)................................................................................................28, 34

U.S.S.G. § 8C2.4(c)..............................................................................................33, 34, 35

U.S.S.G. § 8C2.4(c)'s........................................................................................................34

U.S.S.G. § 8C2.4(d)....................................................................................................33, 34

U.S.S.G. § 8C2.4(d) table.................................................................................................36

U.S.S.G. § 8C2.5.........................................................................................................31, 36

U.S.S.G. § 8C2.5(a)(2)(A)(i) ...........................................................................................32

U.S.S.G. § 8C2.5(b)..........................................................................................................36

U.S.S.G. § 8C2.5(b)(3)......................................................................................................36

U.S.S.G. § 8C2.5(b)(3)(B)................................................................................................36

U.S.S.G. § 8C2.5(d)..........................................................................................................35

U.S.S.G. § 8C2.5(e) ..............................................................................................30, 31, 32

U.S.S.G. § 8C2.6...............................................................................................................37

U.S.S.G. § 8C3.3 .................................................................................................45

U.S.S.G. § 8C3.3(a) ............................................................................................45

U.S.S.G. § 8C3.3(b) ............................................................................................45

U.S.S.G. § 8D1.4(a) ............................................................................................54

Victim and Witness Protection Act of 1982 .......................................................44

**Other Authorities**

*Airwave TETRA System*, IWCE's Urgent Commc'ns (Feb. 2, 2025),
    https://urgentcomm.com/land-mobile-radio/uk-court-of-appeal-rules-against-
    motorola-solutions-solidifies-price-controls-on-airwave-tetra-system ...................51

Blake Brittain, *China's Hytera Pleads Guilty to Stealing Motorola Solutions
    Radio Technology*, Reuters (Jan. 14, 2025) ......................................................55

DOJ, Memorandum on Selection of Monitors in Criminal Division Matters at 2
    (May 12, 2025), https://www.justice.gov/criminal/media/1400036/dl?inline ........56

https://www.law360.com/articles/2399434/hytera-can-t-be-trusted-motorola-says-
    in-push-for-payment); .......................................................................................55

https://www.reuters.com/legal/government/chinas-hytera-pleads-guilty-stealing-
    motorola-solutions-radio-technology-2025-01-14/); .......................................55

Hytera Global Service, Hytera, https://www.hytera.com/en/services/find-service-
    center.html; https://www.hytera.com/en/services/feedback/popular.html (last
    visited Nov. 3, 2025) ..........................................................................................54

Lauraann Wood, *Hytera 'Can't Be Trusted,' Motorola Says in Push for Payment*
    (Oct. 14, 2025) ...................................................................................................55

Members of the DMR Association, DMR, www.dmrassociation.org/dmra-
    members.html (last visited Nov. 3, 2025) ..........................................................5

Mike Baker, Danny Hakim & Blacki Migliozzi, *A Costly Radio System Faltered
    When Texas Needed It Most*, N.Y. Times (Oct. 23, 2025) .................................51

Minute Order Denying Motorola's Mot. to Dismiss, Hytera West Bankruptcy
    (Jan, 22, 2021), Dkt. 423 ...................................................................................9

Richard Vanderford, *China's Hytera Pleads Guilty to U.S. Charge in Motorola
    Solutions' Trade Secrets Theft Case*, Wall Street Journal (Jan. 14, 2025) ...........55

S. Rep. No. 104–179 (1995), *reprinted in* 1996 U.S.C.C.A.N. ...................................43

*Sustainability and Corporate Social Responsibility*, Hytera,
https://www.hytera.com/Global_Sites_en_AE/about-hytera/sustainability.page
(last visited Nov. 3, 2025)..........................................................................................38

## I.     Introduction

Hytera has already been punished far beyond any possible gain it obtained from the failings of its compliance program two decades ago, its former employees' 2008 theft, or any loss that Motorola possibly suffered. The $271.6 million punitive damage award that Motorola will receive—part of more than $600 million in damages, interest, costs, fees, and royalties that Hytera will pay—guarantees that. Indeed, the punitive damages award alone far surpasses the $174 million that Motorola now claims in lost profits. This is an extraordinary punishment for a company with only $524 million in annual revenue.

And Hytera's punishment is not limited to the hundreds of millions of dollars it has and will pay to Motorola. The company faced near-death as a result of its former employees' acts. Immediately after the March 2020 civil judgment, Hytera ran headlong into a liquidity crisis. Its credit rating dropped and its lenders exercised their rights to demand repayment of the nearly $900 million in loans Hytera held with numerous banks. Hytera's American subsidiaries filed for bankruptcy. Hytera's reputation and commercial relationships were in tatters.

Hytera has now turned the page on that chapter of its history. It has revamped its compliance program into one that is state-of-the-art, particularly with respect to intellectual property. It has installed a CEO committed to compliance. It is paying down the Civil Judgment and has already provided Motorola over ███ million in compensatory damages, royalties on accused products from trial, and interest. As a result, this is the rare criminal case where the victim will be compensated far more than any actual loss suffered even if the Court imposes no further punishment at all.

These severe penalties have already accomplished the purposes of criminal sentencing. No company would look at what has happened to Hytera and think that "crime pays." The resounding message is that it does not. Hytera has also learned its lesson and is a much different company

1

today than it was in 2008. It has accepted responsibility for the actions of its former employees, and has implemented an aggressive payment plan to satisfy the full civil judgment within five years. The goals of specific and general deterrence have been accomplished.

All this history precedes sentencing. Now, this Court must decide what additional punishment Hytera will face. The Court's actions must be guided by the central axiom of the sentencing code—that "[t]he court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth" in 18 U.S.C. § 3553(a)(2).

While the Court theoretically could impose a fine to further punish Hytera above and beyond the $271.6 million punitive award Hytera will pay Motorola, the punitive damage award is already greater than the combined total of the four highest criminal fines ever imposed on corporations for trade secret convictions. And any additional fine must be limited to the statutory maximum penalty of $5 million provided under 18 U.S.C. §1832(b) because the government has failed to meet its burden of substantiating any alternative basis for a higher statutory fine. More specifically, the government has failed to identify (1) any specific stolen trade secret; (2) the value of that trade secret to Hytera's radios, taking into account Hytera's own contributions to its radios; or (3) the loss Motorola suffered from its theft. This is not a surprise—the government has never defined the precise trade secrets contained within the information taken by the former Motorola employees. Nor has it undertaken the difficult factual analysis necessary to determine what losses flowed from Hytera's access to those as-of-yet undefined trade secrets. Absent such proof, the Court cannot impose a fine higher than the $5 million prescribed by statute.

All of this extreme and unusual complexity has led the Probation Officer to conclude correctly that restitution is inappropriate in the criminal case, as "the process of calculating a restitution figure would be onerous and extremely complex" and because of the "massive civil

2

judgment [that] has been imposed, [which] will ensure that the victim of this offense is compensated for the hardships resulting from the instant offense."[1] Hytera agrees that restitution is already being handled in the civil case, where Motorola is aggressively enforcing its judgment around the world, and agrees that additional restitution is unnecessary.

Finally, the Probation Officer and Motorola both propose a number of conditions of probation. Hytera largely agrees that the Probation Officer's proposals are largely appropriate. In contrast, Motorola's probation terms are inappropriate for the criminal case, and most duplicate proposals pending before Judge Pacold in the civil case. Hytera also respectfully submits that Motorola cannot serve as the gatekeeper over its biggest competitor and use the levers of the criminal justice system to accomplish what it has not otherwise achieved through civil litigation or the market. Further, the highly complex analysis required to implement Motorola's proposed conditions, including injunctive relief, would draw on Court resources for years to come. Such additional relief is not warranted or appropriate here.

## II.     Factual Background

### A.     *The Theft*

The government's indictment arises from the actions of seven former-Motorola employees: GS Kok, the lone cooperator in this case; Samuel Chia; YT Kok; PE Huang; Eunice Chua; Ken Wong; and Yu Kok Hoong.[2] Starting in 2008, while employed by Motorola in Malaysia and under the direction of GS Kok, these seven dreamt up and executed the theft of Motorola documents and source code to feather their own nest.[3] They coordinated over personal email accounts; maintained Motorola materials on separate, restricted laptops; converted source code files into non-readable

---

[1] PSR Rec. at 2.
[2] ECF 12.
[3] Def. Ver. at 23–25.

3

libraries; spoke together in English, so others at Hytera would not understand; avoided using Hytera's shared repositories; and once that theft was complete, planned a "secret project" to repeat the same feat at a different company.[4] When Motorola brought its civil suit in 2017, Hytera discovered through its internal investigation that both Chia and Huang had deleted documents and hid laptops.[5] Several of the former Motorolans refused to cooperate with Hytera's investigation, asserting their Fifth Amendment right against self-incrimination throughout the civil case, and to this day, six of them remain safely ensconced overseas.[6] In contrast, Hytera is—and has been— here, facing justice, taking responsibility, and remedying the damage. This reality and the evidence plainly refute the government and Motorola's claims that the former Motorolans' acts were the result of any corporate directive.

### B.    *The Asserted Motive*

The government and Motorola describe Hytera as desperate to steal Motorola's technology—implicitly recognizing that without establishing that larger corporate motive, the crime really is limited to the ex-Motorolans. But the evidence shows that the crime really was that limited.

Hytera was capable of producing a DMR radio without the theft.[7] Contrary to the government's allegations that Hytera "lagged far behind Motorola in DMR development," by mid-2007, before hiring any of the individual codefendants, Hytera had already developed a working DMR radio.[8] The government's own exhibits show that by 2007 Hytera was pursuing patents to protect its DMR-related inventions and was engaged in "completely independent research"

---

[4] Def. Ver. at 23–25; ECF 249 at 11–12.
[5] ECF 249 at 26–28.
[6] ECF 3 (order on former Motorolans' arrest warrants).
[7] *See, e.g.*, Ex. 1, Expert Report of Andrew Grimmett (Nov. 2, 2025) ("Grimmett Rpt.") § VIII.C.
[8] *See, e.g.*, Def. Ver. at 11; Ex. 1, Grimmett Rpt. §§ VII.B.3, VIII.A & C, Appx. 2, § XIII–XIV.

developing DMR technology.[9] And that is not surprising in light of Hytera's other advancements. A year prior, in 2006, Hytera had launched a digital TETRA radio, and from 2004–2008, it had quadrupled its engineering staff.[10]

The government likewise inaccurately describes the regulatory landscape at the time, as though Hytera had to make significant changes to its products or risk becoming obsolete. The government claims, based solely on the testimony of GS Kok, that in 2007 the FCC issued a digital mandate requiring that all radios cease using analog technology and switch to digital.[11] But there was no such mandate, and the government's narrative is wrong.[12] In 2004, the FCC implemented "narrowbanding" deadlines targeting 2011—when it would cease issuing certain types of licenses—and 2013—when radios needed to comply with the narrowband regulation.[13] This deadline required radios to use less of the electromagnetic spectrum, but was technology neutral, meaning both analog and digital radios could comply.[14] Notably, Hytera's analog radios already met the narrowbanding requirement when the deadlines were issued.[15] And analog technology is still used and sold today, including by Motorola.[16]

Finally, within just two years of Hytera's 2010 launch of its first DMR products, no fewer than 14 other manufacturers followed suit and launched their own DMR products.[17] Over 80 manufacturers make DMR products today.[18] There are no allegations that those other

---

[9] See Def. Ver. at 11.
[10] Id. at 13, 3. See also, Ex. 1, Grimmett Rpt. ¶¶ 79, 89.
[11] Def. Ver. at 11; Ex. 1Grimmett Rpt. § VIII.A.1–3.
[12] Grimmett Rpt. § VIII.A.1, 2.
[13] Def. Ver. at 12; Ex. 1, Grimmett Rpt. ¶¶ 43, 46.
[14] Def. Ver. at 12; Ex. 1, Grimmett Rpt. ¶ 44.
[15] Ex. 1, Grimmett Rpt. ¶¶ 45–46.
[16] Def. Ver. at 12–13; Ex. 1, Grimmett Rpt. ¶ 44.
[17] See Ex. 1, Grimmett Rpt. § VII.B.3; DTX-4135 at 9.
[18] See Members of the DMR Association, DMR, www.dmrassociation.org/dmra-members.html (last visited Nov. 3, 2025).

manufacturers stole Motorola trade secrets, and those companies simply wrote their own source code.[19] Nothing in the record suggests that the market has ever placed the same value on Motorola's source code and information as Motorola has. In short, Motorola's stolen information was not the crown jewels—not to Motorola, or to anyone else.

### C.    The Civil Litigation

This is the unusual criminal case where a related multi-year civil litigation *precedes* sentencing. The government's effort to rely on the outcome of that litigation as a substitute for meeting its burden of proof in this criminal case offends due process.

#### 1.    The Civil Trial

On March 14, 2017, Motorola filed multiple lawsuits arising out of the theft perpetrated by the individual defendants indicted here—the civil trade secrets and copyright case in this District[20]; the patent case in this District[21]; and the International Trade Commission proceeding[22]. All three cases arise out of the same underlying facts and relate to the same core products, digital two-way radios practicing the DMR standard.

In response to these lawsuits, Hytera immediately launched an internal investigation.[23] It promptly retained U.S. counsel, Finnegan, to oversee it.[24] Although the former Motorolans initially professed a willingness to work with Hytera and Finnegan, they became less cooperative as the investigation progressed, and Hytera ultimately terminated their employment.[25]

---

[19] *See* Ex. 1, Grimmett Rpt. ¶ 63; *see also, e.g.*, Exibit 2, Expert Report of Todor Cooklev (Apr. 5, 2024) ("Cooklev Rpt.") § XII.O.3.a(1) (showing how Motorola source code ███████████████████████ ██████████████).
[20] No. 17-cv-1973.
[21] No. 17-cv-1972.
[22] Inv. No. 337-TA-1053.
[23] Civil Trial Tr. (Luo) at 3110:17–25.
[24] Civil Trial Tr. (Luo) at 3110:17–25.
[25] Civil Trial Tr. (Luo) at 3247–48.

Hytera's investigation and discovery in the civil case revealed that the former Motorolans downloaded confidential source code and documents from Motorola and brought those materials to Hytera.[26] Once those facts became clear Hytera never disputed them.[27] As a result of Hytera's diligence in civil discovery, it uncovered and forensically restored laptops and other data that the former Motorolans had attempted to delete and produced that evidence to Motorola.[28] Those materials were some of the strongest evidence against Hytera in the entire case.[29]

After a four-month jury trial, the jury rendered a general verdict in Motorola's favor in the amount of $765 million in compensatory and punitive damages under the Defend Trade Secrets Act and the Copyright Act.

The jury's damages verdict included three components: (1) compensatory damages of $136.3 million in infringer's profits under the Copyright Act, for the period from Hytera's launch in 2010 to DTSA's effective date in 2016, (2) compensatory damages of $209.5 million in unjust enrichment under DTSA from 2016 through mid-2019, and (3) punitive damages under DTSA of $418.8 million under DTSA (twice the compensatory award under DTSA).[30]

The jury's $209.5 million DTSA compensatory award included two sub-components— $135.8 million in Hytera's profits and $73.6 million in "avoided R&D costs."[31] In post-trial motions, Hytera showed that the entire damages verdict constituted disgorgement, which was an equitable remedy, requiring findings by the Court, rather than a jury.[32] Judge Norgle therefore ruled that the jury's verdict was "an advisory verdict."[33] That means it was a legal nullity, with

---

[26] Civil Trial Tr. (Luo) at 3253:5–11.
[27] Civil Trial Tr. (Luo) at 3253:12–15.
[28] Def. Ver. at 27–28.
[29] Def. Ver. at 26.
[30] Civil Dkt. 898; *see also* Civil Dkt. 1100 at 4 (¶ 9).
[31] Civil Dkt. 1100 at 4 (¶ 9).
[32] Civil Dkt. 1100 at 4 (¶¶ 11–12), 24 (¶ 81); *see also* Civil Dkt. 1088 at 26.
[33] Civil Dkt. 1088 at 26; Civil Dkt. 1100 at 3 (heading II).

zero effect.[34] Judge Norgle then determined, sitting in equity, that the award of *both* $135.8 million in Hytera's profits *and* $73.6 million in "avoided R&D costs" constituted double recovery and reduced the DTSA compensatory and punitive awards to $135.8 million and $271.6 million, respectively.[35] The total award was therefore reduced—prior to appeal—by more than $200 million, to $543.7 million.[36]

### 2. Post-Judgment

#### a. *Hytera Faced a Liquidity Crisis*

After the March 2020 $765 million judgment, Hytera fell into crisis.[37] The size of the judgment posed an existential threat.[38] The company's credit score dropped, and its lenders immediately began requiring it to pay down the nearly $800 million in loans that had accumulated.[39] Any funds it received through key sales (like proceeds from the sale of its indirect subsidiary, Sepura, in the UK, or proceeds from the sale of what was to be its flagship Shenzhen office building) went to basic survival—including paying employee salaries and paying down bank debt.[40]

#### b. *Hytera's US Subsidiaries Filed for Voluntary Bankruptcy*

Hytera's two US-based subsidiaries (who were its civil trial co-defendants and then co-judgment debtors) filed for bankruptcy immediately following the judgment, as they were jointly

---

[34] *Price v. Marshall Erdman & Assocs., Inc.*, 966 F.2d 320, 324 (7th Cir. 1992) (comparing "the effect of an advisory jury's verdict (none) with the effect of a real jury's finding . . . (preclusive)"); *OCI Wyoming, L.P. v. PacifiCorp* 479 F.3d 1199, 1206 (10th Cir. 2007) (appellate review of findings with an advisory verdict conducted "as if there had been no verdict from an advisory jury") (citation omitted).
[35] Civil Dkt. 1100 at 23–24 (¶¶ 79–86).
[36] Civil Dkt. 1100 at 89 (¶ 42).
[37] HCC raised numerous legal errors associated with the jury award, and Judge Norgle ultimately agreed—reducing it by over $200 million, to $543.7 million. Dkt. 947 & 1100 at 39.
[38] Exibit 3, HCC 2020 Annual Report at 206–209 (reporting on parent company balance sheet at the end of 2019 and 2020).
[39] Exibit 4, Declaration of Jilian Kang (February 4, 2025) Civil Dkt. 1829 (Kang Decl.) ¶¶ 3–7; Civil Dkt. 1829-1 (HCC credit levels records).
[40] Ex. 4, Civil Dkt. 1829 (Kang Decl.) ¶¶ 8–15.

and severally liable for the $765 million judgment.[41] Motorola challenged the propriety of those

bankruptcy proceedings and claimed Hytera was acting in bad faith to avoid paying the judgment.[42]

*Both* the Creditors' Committee *and* the Bankruptcy Court *disagreed* with Motorola.[43] The

bankruptcy judge approved the debtors' plan and denied Motorola's motion to dismiss the

bankruptcy.[44] As the largest creditor, Motorola received the largest portions of the debtors' assets

under the approved plan (approximately $15 million).[45]

c. *The District Court Denied Motorola's Motion for a Permanent Injunction and Permitted Hytera to Sell the Accused Products Subject to a Royalty*

Post-trial, Motorola sought a permanent injunction against Hytera, seeking to prevent

Hytera from using "Motorola Trade Secret Information"—a term that only loosely incorporated

trade secrets from the civil trial and which were themselves never defined.[46]

Judge Norgle denied the requested injunction—after concluding that, "'[t]his case is about

money'" and that Motorola had not shown "irreparable harm."[47] Judge Norgle then set a royalty

rate (to be paid quarterly) of $80.32 per radio and $378.16 per repeater, which represented 100%

of "Hytera's expected future incremental profits" on the covered devices.[48] That royalty rate, he

explained, contemplated and compensated Motorola for the calculable loss in market share and

---

[41] *See In re HCA West, Inc.*, Case No. 8:20-bk-11507 (C.D. Cal. Bkr. filed May 26, 2020) ("Hytera West Bankruptcy Dkt.") and *In re Hytera America, Inc.*, Case No. 8:20-bk-11509 (C.D. Cal. Bkr. filed May 26, 2020) (the two matters were consolidated).

[42] *See* Mot. to Dismiss, Hytera West Bankruptcy (July 14, 2020), Dkt. 111.

[43] *See, e.g.*, Opp. to Mot. to Dismiss at 2, Hytera West Bankruptcy (Aug. 6, 2020), Dkt. 164 ("The Committee submits that there is no evidence of bad faith or "cause" to warrant the dismissal of the Debtors' bankruptcy cases pursuant to 11 U.S.C. § 1112(b).").

[44] *See* Minute Order Denying Motorola's Mot. to Dismiss, Hytera West Bankruptcy (Jan, 22, 2021), Dkt. 423.

[45] Amended Discl. Stmts., Hytera West Bankruptcy (Dec. 2, 2021), Dkt. 597; BNC Certificate of Notice, *id.* (June 11, 2022), Dkt. 755; Post-Confirmation Status Rptr., *id.* (Nov. 23, 2022), Dkt. 776.

[46] *See* Civil Dkt. 986 at 17–19.

[47] Civil Dkt. 1097 at 4 (citations omitted).

[48] Exibit 5, Civil Dkt. 1289 at 20; *see also id.* at 9, 18, 38–39 (adopting a rate "derived directly from" the Court's award of 100% of Hytera's profits, adjusted only for management costs).

lost profits Motorola had argued it would suffer from Hytera's future sales (and indeed exceeded Motorola's loss).[49]

### d.    The Seventh Circuit Further Reduced the Judgment

In October 2024, the Seventh Circuit returned its mandate, reversing the award of foreign damages under the Copyright Act (by "an order of magnitude") and finding that the District Court had failed to consider what portion of Hytera's profits were attributable to factors other than Motorola's intellectual property.[50] The parties have agreed that the Seventh Circuit's ruling reduced the copyright portion of the judgment to a maximum of $14 million (which represents Hytera's profits from US-based sales of the accused products), and the District Court is now considering the apportionment of those profits to allow for Hytera's own contributions to the products.[51] The Seventh Circuit also concluded that Judge Norgle similarly failed to consider apportionment as to the DTSA portion of the judgment but determined—Hytera believes erroneously—that Hytera had "forfeited" its objection to the failure to apportion the DTSA judgment by not raising it in its opening brief.[52]

### e.    Post-Mandate, Hytera Has Steadily Paid Down the Judgment

In December 2024, Motorola filed a (renewed) motion for cash turnover, demanding (as it had while the appeal was pending[53]) that Hytera be ordered to pay the entirety of the judgment within 30 days or face a global injunction against all sales of two-way radio products, without

---

[49] Ex. 5, Civil Dkt. 1289 at 23.
[50] Civil Dkt. 1779; *Motorola Sols., Inc. v. Hytera Commc'ns Corp. Ltd.*, 108 F.4th 458, 472, 505 (7th Cir. 2024).
[51] *See* Civil Dkt. 1812 at 11.
[52] *Motorola Sols., Inc.*, 108 F.4th at 472, 489
[53] While the appeal of the civil judgment was pending, Motorola sought to enforce it through two separate turnover motions, both of which were denied. Civil Dkts. 1172, 1348. In particular, Judge Norgle held that enforcement would be "premature" in view of the "significant appeal" pending. Civil Dkt. 1348 at 3.

identifying any specific, available cash assets to be turned over.[54] In response, Hytera offered a payment plan based on its anticipated positive net cashflow from operations.[55] It has been steadily paying down the judgment, and to date has paid Motorola over ███ million in compensatory damages, royalties on adjudicated products from trial, and related interest.[56]

### f.    Hytera's New Redesigned H-Series DMR Products

After the civil trial, Hytera engaged in a rigorous and time-intensive redesign process to develop a DMR product that was free of any influence of Motorola's alleged trade secrets or copyrights. Over the course of eighteen months, Hytera engaged outside experts, created a separate clean room facility, and employed over 100 engineers dedicated to the redesign.

In October 2021, Hytera launched the redesigned DMR products—the "H-Series."[57] Motorola immediately sought to include those products within the scope of the Royalty Order, but Judge Norgle rejected that request and held that they were not within its scope because they had not been adjudicated at trial.[58]

In February 2024, after Judge Norgle retired, Motorola initiated contempt proceedings against Hytera, asserting that the H-Series DMR products fell within the Royalty Order and that Hytera owed royalties on those sales.[59] The parties have been engaged in a significant civil dispute over these issues, as Hytera maintains that this H-Series was the product of a very substantial redesign and does not misappropriate Motorola's trade secrets.[60] Judge Pacold recently found

---

[54] Civil Dkt. 1803-1.
[55] Civil Dkt. 1824 at 1, 6, 9.
[56] Civil Dkt. 1916 (Richey Decl.).
[57] *Compare* Civil Dkt. 1717 at 87 (detailing October 2021 launch), *with* ECF 12 (Indictment filed May 2021).
[58] Ex. 7, Civil Dkt. 1338 at 8.
[59] Civil Dkt. 1483.
[60] Civil Dkt. 1717.

otherwise, and Hytera has appealed that decision.[61] In the meanwhile, Hytera has sought permission to place cash in the full amount of all disputed H-Series royalties and interest (over ███ million) into the civil court's interest-bearing registry account as security pending its appeal.[62] Once that cash is in escrow, Hytera will have paid Motorola (or placed in escrow for its benefit) over ███ million.

## III. The Government Has Failed to Prove Essential Facts

The government now wants Hytera to pay up to a $60 million fine and hundreds of millions more in restitution. But to achieve either of those results, the government must first prove the gain Hytera received or loss Motorola incurred from the 2008 theft, and both of those calculations are bound up in defining the precise trade secrets stolen. Such proof is required *prior* to determining the statutory maximum fine available under the Economic Espionage Act (18 U.S.C. § 1832(b)) or the Alternative Fines Act (18 U.S.C. § 3571), the base fine under Chapter 8 of the Guidelines, or the size of any restitution award under the MVRA. And such proof requires evidence and complex fact-finding about the trade secrets and related gains or losses, not simple gestures to the civil case. That is all the more true here, where the civil case record does not establish the underlying facts the government wants to take for granted.

### A. Sentencing Implicates Four Related-But-Distinct Legal Inquiries

1. Statutory Maximum Fine Under 18 U.S.C. § 1832(b)

Section 1832(b) establishes the statutory maximum fine applicable to corporate defendants convicted of a trade secret theft offense, and the maximum fine is calculated according to "the *value of the stolen trade secret* to the organization."[63]

---

[61] Civil Dkts. 1899, 1906.
[62] Civil Dkt. 1921.
[63] 18 U.S.C. § 1832(b) (emphasis added).

2.      Statutory Maximum Fine Under 18 U.S.C. § 3571(d)

Under the Alternative Fines Act, 18 U.S.C. § 3571(d), "[i]f any person *derives pecuniary gain from the offense*, or if the *offense results in pecuniary loss* to a person other than the defendant, the defendant may be fined not more than the *greater of twice the gross gain or twice the gross loss*."

3.      Base Fine Under Chapter 8 of the Guidelines

To determine the fine range pursuant to U.S.S.G. § 8C2.4, the Court must determine the greater of "*the pecuniary gain* to the organization from the offense," "*the pecuniary loss* from the offense caused by the organization, to the extent the loss was caused intentionally, knowingly, or recklessly," or an amount determined by reference to the offense level.[64]

4.      Restitution Under the MVRA

For property offenses, restitution under the MVRA depends on the amount of diminution in "the *value of the property*."[65]

**B.      The Government Has Not Attempted to Define—and Hytera Has Not Admitted—What the Trade Secrets Are**

DMR is a standardized communications protocol—available for any company around the world to use in its radios.[66] Motorola was the primary proponent of DMR technology and contributed many of its patented inventions to the standard—reaping patent license fees from all who chose to use the standard.[67] Throughout the civil case, Motorola described its trade secrets with reference to generic, well-known features that are found within every DMR radio, claiming that its trade secrets lie in Motorola's "specific design and implementation" of those well-known

---

[64] U.S.S.G. § 8C2.4(a) (emphasis added).
[65] 18 U.S.C. § 3663A(b)(1) (emphasis added).
[66] Ex. 1, Grimmett Rpt. ¶¶ 31–34.
[67] Ex. 1, Grimmett Rpt. ¶¶ 31, 32, 36; Ex. 2, Cooklev Rpt. ¶¶ 145–155.

features.[68] The parties' dispute about the scope and definition of Motorola's trade secrets pervaded the civil case, and was never resolved.[69] Post-trial, in the context of deciding which products would be covered by the Royalty Order, Judge Norgle expressly recognized the parties' ongoing dispute about the definitions of the trade secrets but ultimately found it unnecessary to resolve.[70]

The criminal case suffers from the same issues. The government has never properly defined the trade secrets, nor has it explained how it will prove the gains or losses that it claims flow from the value of any specific trade secret. Instead, the government's version of the offense merely relies on bottom-line conclusions: cut-and-pasted from the civil case. But if the Court plans to impose a fine greater than the default statutory $5 million under 18 U.S.C. § 1832, undertake the analysis required by Chapter 8 of the Guidelines to determine Hytera's Guideline range, or require any amount of restitution, it will have to engage with these deeply complicated and technical issues. Proving these issues with evidence will take weeks of fact and expert testimony. The government's hope of short-cutting this task offends due process.

The government seems to gloss over that Hytera admitted in its Plea Agreement only to conspiring to steal "at least one trade secret."[71] While Hytera has admitted that "[i]n or around 2008, the individual co-defendants agreed to take, without authorization, certain Motorola documents and source code related to DMR technology" and "did so intending to convert at least one trade secret for Hytera's use in producing DMR products into interstate commerce,"[72] the Plea

---

[68] Ex. 1, Grimmett Rpt. ¶¶ 60–64; Ex. 2, Cooklev Rpt. ¶¶ 88–92. This was true about Motorola's evidence at trial as well as the expert report of Dr. Wicker, which the government recycles here.
[69] *See, e.g.*, Ex. 1, Grimmett Rpt. §§ VIII.B.1–3.
[70] Ex. 5, Civil Dkt. 1289 at 7.
[71] ECF 353 at 2.
[72] ECF 353 ¶ 6.

Agreement does not specify what the underlying trade secrets were, or even that any stolen information satisfies the legal definition of a trade secret.[73]

Hytera certainly did not admit that the charged conspiracy involved any of the purported trade secrets alleged in the Indictment, for as Hytera has claimed throughout this case, the government has never defined the trade secrets charged in the indictment. While the indictment purports to assert fifteen trade secrets, the government failed to address six of those alleged trade secrets (G, J, K, M, N, and O) before the grand jury, and its presentation on the remaining ones was legally insufficient.[74] As the case progressed, the government's articulation became even more muddled. In response to Hytera's motion to dismiss and for a bill of particulars, the government filed "Attachment A," purporting to tie select grand jury exhibits to five specific trade secrets, notwithstanding that the indictment alleged fifteen trade secrets.[75] In its *Santiago* proffer, the government blurred the lines further, claiming for the first time that the indictment did not specify *any* trade secrets, but only "fifteen specific *categories* of trade secrets," an admission it had denied just one year prior in response to Hytera's motion to dismiss.[76]

The government's sentencing position is now more muddled still. In its Version of the Offense, the government merely attached the expert report of Dr. Wicker, asserting that his report defined Trade Secrets A through O.[77] The government did nothing to address the many legal and factual points that Hytera has raised about the inadequacies and errors in Dr. Wicker's approach,

---

[73] *Id.* ("By admitting these facts, defendant reserves the right to challenge at sentencing whether the trade secrets alleged by the government are in fact trade secrets.").

[74] *See, e.g.*, ECF 102; ECF 107 at 6–8; ECF 306.

[75] ECF 120.

[76] *Compare* ECF 220 at 7 n.3 (emphasis added), *with* ECF 119 at 18 ("Defendant argues that the government has failed 'to identify a single actual 'trade secret'' and instead identifies 'categories of technical data.' Motion to Dismiss at 1. That is not accurate. As defendant is aware, in each of Counts Two through Twenty, the government has identified a particular document that contained (or defendants believed contained) trade secrets.").

[77] G. Ver. at 27.

including that much of what the indicted individuals copied was public, generally known in the industry, or readily ascertainable through proper means.[78] For example, the information included materials and code from third parties, as well as information Motorola publicly disclosed in patents, in service manuals, and elsewhere.[79] Indeed, Motorola alone holds more than 100 patents (i.e., public forms of protected IP) covering the gamut of technology in a DMR radio.[80] The government therefore must do more than simply point to the mound of downloaded material taken in 2008 and claim there must be a trade secret in there somewhere; it must actually identify what the trade secrets are.[81]

### C.    *Motorola's Efforts to Satisfy the Government's Burden Fail As Well*

Recognizing the implication of the government's failure to identify any actual trade secrets, Motorola has now tried to fix the government's failure in two ways. Neither succeeds.

#### 1.    Motorola's Latest Attempt to Define its Trade Secrets

First, Motorola has proposed new definitions of the trade secrets in an attachment to its August 6, 2025 Sentencing Submission in the criminal case. But these new definitions are inconsistent with the indictment, the government's expert's report, *and* the civil trial record.[82] Specifically, Motorola grafts additional asserted trade secrets from the civil trial onto the trade secrets that were alleged in the indictment—even now including trade secrets that it had *dropped* prior to the civil trial.[83] Even more unsettling—these new definitions of the purported trade secrets

---

[78] *See, e.g.*, Ex. 2, Cooklev Rpt. Section XII.
[79] *See, e.g.*, Ex. 2, Cooklev Rpt. Section XI.
[80] Wicker Rpt. at 1307 ¶ 1094.
[81] *Life Spine, Inc. v. Aegis Spine, Inc.*, 8 F.4th 531,540–41 (7th Cir. 2021) ("Trade secret law focuses on the 'concrete secrets' that the plaintiff seeks to protect, rather than 'broad areas of technology.' . . . We focus on the precise information that the plaintiff seeks to protect and ask if it qualifies as a trade secret under the relevant statutory definition.") (citation omitted).
[82] VIS at Attachment 1.
[83] *See* Ex. 1, Grimmett Rpt. ¶¶ 65–70.

are substantively *different* from what Motorola presented to Judge Pacold during the H-Series contempt proceeding just one year ago.[84]

It is unclear whether the government will adopt Motorola's latest effort, but it does not matter. Motorola's trade secret chart suffers from a series of infirmities—its citations are incomplete and do not address the evidence that contradicts its assertions.[85]

### 2. Motorola's False Claims About the Civil Jury's Verdict

Motorola also asks this Court to abandon its own inquiry and adopt the jury verdict from the civil case, using misleading citations to suggest that the jury specifically found that Hytera stole and used twenty-one trade secrets alleged in the civil case. But the jury made no such finding, and the Court will need to make its own decisions here.

During the four-month civil trial, Motorola claimed that Hytera stole twenty-one alleged trade secrets and four asserted copyrights.[86] At the close of trial, the jury rendered a general verdict.[87] What the jury was asked to decide—and what it was not asked to decide—are critically important to what Motorola seeks in restitution and the terms of probation now.

The jury was not asked to determine the existence of any specific trade secret, whether Hytera had misappropriated any specific trade secret, or how Hytera's products had benefited from

---

[84] Ex. 1, Grimmett Rpt. ¶ 70.

[85] Ex. 1, Grimmett Rpt. ¶¶ 65–76.

[86] This was after years of presenting morphing definitions of its trade secrets, which Hytera continually attempted to clarify. *See, e.g.*, Civil Dkt. 352 ¶ 8 (order granting Hytera's motion to compel trade secret identification); Civil Dkt. 422 (Hytera's second motion to compel trade secret identification). Motorola initially identified 20 vague categories of information and several thousand files it claimed were trade secret. That figure later ballooned to 169 vague categories of information and more than 20,000 documents. That figure then shrunk to 142 claimed trade secrets. Before trial, Motorola shrunk its figure further and withdrew 121 of those trade secrets—leaving 21 to be addressed at trial. Discovery in the civil case revealed that none of the 21 trade secrets Motorola ultimately "identified" were ever considered trade secrets by Motorola prior to trial. Motorola's internal logs identified only 3 DMR-related ideas as trade secrets during the relevant period—none of which correspond to the government or Motorola's current theory. Def. Ver. at 56–57.

[87] Civil Dkt. 894.

any specific trade secret. Instead, the only question on the jury's verdict form was whether the jury found that Hytera had misappropriated "one or more" of Motorola's trade secrets.

At Motorola's insistence, and over Hytera's objections, the jury returned a general verdict:[88]

> **1. Do you find that Motorola proved that it possessed one or more trade secret(s) that was/were misappropriated by Hytera?**
>
> Yes ___✓___ (for Motorola)
>
> No _____ (for Hytera)

**4. Do you find that Motorola proved that Hytera infringed Motorola's copyright(s)?**

> Yes ___✓___ (finding for Motorola)
>
> No _____ (finding for Hytera)

The damages award was similarly general, with no finding about any particular use of Motorola's intellectual property or any particular product:[89]

> **6. What is the dollar amount of the compensatory damages, if any, Motorola is entitled to receive from Hytera for the misappropriation of trade secret(s) and/or copyright infringement through June 30, 2019?**
>
> $ 345,761,156

In its victim impact statement, Motorola misrepresents the jury's findings. It states, purporting to quote the jury's verdict form: "a jury in Illinois found that Hytera misappropriated '*all* trade secrets' and infringed '*all* copyrights' asserted by Motorola."[90] But the quoted, bolded, and italicized phrases "*all* trade secrets" and "*all* copyrights" appear nowhere on the verdict form.[91]

---

[88] Civil Dkt. 898 at 1–2.

[89] Civil Dkt. 898 at 4.

[90] VIS at 7.

[91] Civil Dkt. 898. The language Motorola quotes is drawn from Judge Norgle's decision denying Motorola's motion for an injunction, in the context of finding success on the merits. Civil Dkt. 1097 at 3. Judge Norgle's reasoning was grounded in the fact that the jury had awarded Motorola all the damages it asked for. *Id.*

Even so, the jury's damages finding has been deemed advisory.[92] That means it is a legal nullity, with zero effect.[93] And the Seventh Circuit held that Judge Norgle's adoption of portions of the damages verdict failed to consider principles of apportionment.[94]

### D. The Government Has Not and Cannot Establish the Gains or Losses Caused by the Theft of Undefined Trade Secrets

The government contends that the base fine amount and restitution should be determined according to Motorola's lost profits. To prove this, the government simply imports the lost profits calculation that Motorola offered in the civil case. But as detailed below, there are several problems with the methodology the government uses to quantify those purported profits. The correct approach to determining lost profits requires the government to identify (1) what the relevant trade secrets are, (2) how Hytera improperly used those specific trade secrets in developing its DMR radios, and (3) that Hytera's customers chose to purchase Hytera's DMR radios instead of Motorola's because Hytera used those specific trade secrets.[95] The government has failed to do any of these things.

To make a finding about lost profits in the criminal case, the Court will need to engage in a lengthy sentencing hearing involving "intricate issues of proof."[96] This is because in the context of trade secrets, calculating of lost profits requires showing that the victim lost sales *because of* the theft.[97] In other words, the government needs to show that Hytera's customers chose to

---

[92] Civil Dkt. 1088 at 1, 24, 26, 29, 32; Civil Dkt. 1099; Civil Dkt. 1100 at 3.

[93] *Price*, 966 F.2d at 324 (comparing "the effect of an advisory jury's verdict (none) with the effect of a real jury's finding . . . (preclusive)"); *OCI Wyoming, L.P.*, 479 F.3d at 1206 (appellate review of findings with an advisory verdict conducted "as if there had been no verdict from an advisory jury").

[94] *Motorola Sols., Inc.*,108 F.4th at 472, 505.

[95] *See* Ex. 9, Expert Declaration of Debra Aron (May 30, 2025) ("Aron Decl.") ¶ 79; Exibit 8, Expert Report of Tolga Bilgicer (Nov. 2, 2025) ("Bilgicer Rpt") ¶ 185.

[96] *United States v. Betts*, 99 F.4th 1048, 1061 (7th Cir. 2024).

[97] *Mangren Rsch. & Dev. Corp. v. Nat'l Chem. Co.*, 87 F.3d 937, 945 (7th Cir. 1996); *Euroholdings Cap. & Inv. Corp. v. Harris Tr. & Sav. Bank*, 602 F. Supp. 2d 928, 936 (N.D. Ill. 2009) ("When seeking recovery of lost profits under Illinois law, the lost profits must be established with a reasonable degree of certainty and be traceable to defendant's wrongful conduct." (citing *TAS Distrib. Co., Inc. v. Cummins Engine Co.*,

purchase Hytera's DMR radios *because* Hytera used Motorola's trade secrets, which gave Hytera's radios some advantage over the next best alternative.[98] Otherwise Hytera's sale would not have been *caused* by the trade secret theft. Further, the government also needs to show that the purported lost customer would instead have purchased Motorola's radio—otherwise the sale (and the related profits) would not be "lost" by Motorola. For example, the government could show that Hytera's radios would have been different if Hytera had not had access to the trade secrets, and because of that difference, certain Hytera customers would have chosen instead to purchase radios from Motorola.

To prove that Hytera's customers chose to buy Hytera's radios because they benefitted from Motorola's trade secrets, the government will need to show *how* Hytera's radios benefitted from Motorola's trade secrets. The government will need to point to specific attributes of Hytera's radios that benefited from the trade secrets in a way that Hytera could not have achieved without the trade secrets.[99] The government will then need to demonstrate how that specific benefit affected

---

*Inc.*, 491 F.3d 625, 633 (7th Cir. 2007)); *see also Hunter Bldgs. & Mfg., L.P. v. MBI Glob., L.L.C.*, 436 S.W.3d 9, 17–21 (Tex. App. 2014) (reversing lost profits damages where plaintiff's expert failed to connect lost sales to use of trade secrets).

[98] *See Grain Processing Corp. v. Am. Maize-Prods. Co.*, 185 F.3d 1341, 1355 (Fed. Cir. 1999) (where alternative products in the market "differ[] from the [IP owner's] product in one or more respects, the [owner] must adduce economic data supporting its theory of the relevant market" in order to show it lost sales because of the infringement); *Hunter Bldgs. & Mfg., L.P.*, 436 S.W.3d at 20 .

[99] *See, e.g.*, *Mangren Rsch. & Dev. Corp.*, 87 F.3d at 944 (defendant's "use" of the trade secret, which caused lost profits, was use of a particular "essential secret ingredient—a highly degraded PTFE having a low molecular weight and low tensile strength" and not the overall formula in question); *Gold Medal Prods. Co. v. Bell Flavors & Fragrances Inc.*, No. 1:17-CV-4084, 2018 WL 1135629, at *3 (N.D. Ill. Mar. 2, 2018) (noting the "specific chemical composition of the ingredient" was the component "important for the recipe and flavor profile" as distinct from public information about the ingredient); *Composite Marine Propellers, Inc. v. Van Der Woude*, 962 F.2d 1263, 1266 (7th Cir. 1992) (reversing compensatory damages verdict where some confidential information qualified as a trade secret but had never been used in the defendant's product).

consumer behaviors, including by "reconstructing the market" to assess how consumer behaviors were changed.[100]

As should be clear, this entire analysis requires the government to first articulate what Motorola information qualified as a protectible trade secret, and then how Hytera used *that articulated trade secret information*.[101] Otherwise, any analysis of consumer behavior would conflate behaviors attributable to the theft with behaviors attributable to information that was always legitimately available to Hytera, even if the theft had not occurred.[102]

The government has failed to undertake any of this analysis. As explained in the expert report of Todor Cooklev, the evidence proffered by the government fails to articulate a single concrete trade secret.[103] As explained in the declaration of Debra Aron, the government (via Malackowski) has failed to consider how Hytera's products or the market generally would have been different without the benefit of Motorola's trade secrets, or how customer behavior would have changed as a result.[104] And as explained in the expert report of Tolga Bilgicer, it is not apparent that even the generic technologies related to the asserted trade secrets affected consumer behavior.[105]

---

[100] *Grain Processing Corp.*, 185 F.3d at 1350–51 (discussing "[r]econstructing the market" to determine what sales would have occurred but for an offense, which requires "project[ing] economic results that did not occur."). In the appeal from the civil case, the Seventh Circuit explained that damages cases from a variety of contexts (such as patent cases) can be informative in trade secret cases. *Motorola Sols., Inc.*, 108 F.4th at 488; *see also Grain Processing Corp.*, 185 F.3d at 1350–51(requiring that lost profits be grounded in "sound economic proof of the nature of the market and likely outcomes with [the offense] factored out of the economic picture."); Ex. 9, Aron Decl. ¶¶ 44–46.

[101] *See, e.g.*, *Mangren Rsch. & Dev. Corp.*, 87 F.3d at 942 (court could turn to other questions, such as assessing the lost profits case only after "[h]aving determined that [plaintiff] established a protectable trade secret in its mold release agent formula"); *see also Composite Marine Propellers, Inc. v. Van Der Woude*, 962 F.2d at 1266 (reversing compensatory damages verdict where some of the confidential information at issue did not qualify as a trade secret).

[102] *See, e.g.*, Ex. 8, Bilgicer Rpt. §§V.A–E; Ex. 1, Grimmett Rpt. VIII.C.

[103] *See generally*, Ex. 2, Cooklev Rpt. § XII. *See also* Ex. 1, Grimmett Rpt. § VIII.B.

[104] *See generally*, Ex. 9, Aron Decl. § V.A.

[105] *See generally*, Ex. 8, "Bilgicer Rpt" §§ V.C–D.

The government's proffered expert instead built his calculation of lost profits on the unsubstantiated assumption that if Hytera had not misappropriated Motorola trade secrets as alleged in the civil case, then Motorola would have made approximately 70% of Hytera's DMR sales in the United States and approximately 40% of Hytera's DMR sales abroad. But Motorola's general market share is not a reliable proxy for predicting the specific DMR sales that Motorola would have made for several reasons:

- Malackowski never explained what attributes of Hytera's radios were attributable to the use of the trade secrets, nor how those attributes affected customers' purchasing decisions.[106]

- Malackowski's market share approach did not account for customers' individual preferences.[107]

- Malackowski failed to consider that many of Hytera's customers purchased from Hytera and not Motorola because Hytera developed differentiating features and business practices that met those customers' needs, while Motorola did not. Plainly, if Motorola could not meet a customer's requirements, it would not have made the sale (and earned corresponding profits) regardless of the conspiracy. Abundant evidence demonstrate that factors unrelated to the trade secrets, including features that Motorola lacked, were the actual drivers of Hytera's sales.[108]

- Malackowski's market share approach improperly conflated geographic markets—relying on simply "U.S." versus "Outside U.S." shares, even though sales are made through hyper-local dealer networks.[109]

- Malackowski failed to consider Hytera's positive impact on the adoption of the DMR standard, which relegated competing standards.[110] If Hytera had not entered the DMR market in 2010, or if it had done so with a lower-quality product, the DMR standard would have faltered to Motorola's detriment.

- Finally, Malackowski failed to consider the impact of Hytera as a market competitor selling a different, non-infringing digital two-way radio product.[111] If

---

[106] Aron Decl. ¶ 79. Indeed, nor has anyone compared Motorola's implementations of the alleged trade secrets to any other manufacturer's implementations of the technology. *See* Ex. 1, Grimmett Rpt. ¶ 102; Civil Trial Tr. (Wicker) 5263:4–21.

[107] Ex. 9, Aron Decl. ¶¶ 56–61, 79–80; Ex. 8, Bilgicer Rpt. ¶¶ 56, 65–71, 186–194.

[108] Ex. 9 Aron Decl. ¶¶ 79–80; Ex. 8 Bilgicer Rpt. ¶¶ 158–170.

[109] Ex. 9 Aron Decl. ¶ 48.

[110] Ex. 1, Grimmett Rpt. ¶¶ 32–38; Ex. 9, Aron Decl. ¶¶ 79–81.

[111] Ex. 9 Aron Decl. ¶¶ 45, 80.

the conspiracy had not occurred, Hytera would have been free to compete with Motorola lawfully and aggressively.

### E. Even Accepting Malackowski's Market Share Methodology, the Resulting Calculation Is Wrong

Even if Malackowski's market-share methodology were to be applied, his application of that methodology incorporates significant errors that require correction. Profit is revenue minus costs, but Malackowski's lost-profits figure fails to deduct two major Motorola costs:

- Malackowski failed to account for Motorola's "management costs." As detailed in the declaration of Debra Aron, that amounts to approximately ███████, which must be deducted from revenue when calculating Motorola's profits.[112]

- Malackowski also failed to account for Motorola's research and development expenses. As detailed in the declaration of Debra Aron, that amounts to approximately ██████, which must be deducted from revenue when calculating Motorola's profits.[113]

### F. The Government Has Not Proven What Hytera's Gains Were

The government has not provided any evidence to date of Hytera's gain, nor how any such gains might be tied to the trade secret theft here. To do so, the Court would need to again consider precisely what the trade secrets are that were stolen, the extent to which those particular trade secrets manifested in Hytera's competing product, and, as the Seventh Circuit recognized in the civil case, the extent to which Hytera's profits were attributable to its own contributions to its radios, such as features it developed or its extensive dealer network.[114] As discussed above, despite an award of profit disgorgement, that analysis was not done in the civil case.[115]

As Andy Grimmett and Todor Cooklev both explain in their reports, the government has fallen far short of articulating concrete trade secrets, much less with sufficient detail to separate

---

[112] Ex. 9, Aron Decl. ¶¶ 62–69, 76, 89–90.
[113] Ex. 9, Aron Decl. ¶¶ 70–72, 76, 89–90.
[114] *Motorola Sols., Inc.*, 108 F.4th at 489 (finding apportionment required on trade secret claim but finding harmless error due to forfeiture on appeal).
[115] *Id.*

23

out the benefit the trade secrets conferred as opposed to other legitimate factors.[116] And as Tolga Bilgicer explains, market evidence overwhelmingly shows that factors *other than* the technology purportedly enabled by the trade secrets drove consumer interest in Hytera's products.[117] Accordingly, the government has not shown that the Court can rely upon Hytera's gains to support any of its findings here.

## IV. Objections to the PSR

### A. *Correction to the PSR's Statutory Maximum Fine Calculation*

The Probation Officer concluded that the statutory maximum fine can be higher than $5,000,000 because Judge Norgle found that "Hytera's trade secrets theft enabled Hytera to avoid $73.6 million in research and development costs."[118] Accordingly, the PSR concluded that the fine could be as much as $220,800,000.[119] This calculation rests on several inaccurate premises.

First, as noted, neither the PSR nor the government has identified any specific trade secrets that form the basis for determining that the entire $73.6 million in avoided R&D costs should count. This is particularly problematic because 21 purported trade secrets were at issue in the civil case, and only 15 are at issue in the criminal case. Next, Judge Norgle's statement is not a sufficient basis to find against Hytera. Judge Norgle stated that "the evidence supports $73.6 million for Hytera's avoided research and development costs," which was the sum proffered by Motorola.[120] But that statement was dictum: in the very next sentence, Judge Norgle explained that awarding both "avoided research and development and Hytera's profits would constitute a double

---

[116] Ex. 1, Grimmett Rpt. § VIII.B. Cooklev Rpt. XII; *see also* Ex. 2, Cooklev Rpt. § III.
[117] Ex. 8, Bilgicer Rpt. ¶¶ 158–170. *See also* Grimmett Rpt. ¶¶ 86–88, 94, 101–106; Civil Trial Tr. (Grimmett) at 4332:16–4334:10.
[118] PSR ¶ 129.
[119] PSR ¶ 132.
[120] Civil Dkt. 1100 at 15 ¶ 46.

recovery."[121] Because Motorola's calculation of Hytera's profits exceeded Motorola's calculation of avoided R&D, Judge Norgle awarded the larger remedy.[122]

Moreover, the reasoning Judge Norgle offered for adopting (in dictum) Motorola's $73.6 million calculation was erroneous. Judge Norgle cited Motorola's expert's testimony that "because all of the trade secrets were misappropriated the full amount of . . . Hytera's avoided R&D should be awarded."[123] But there was *no finding* that all of the trade secrets had been misappropriated.[124] Moreover, the statutory language of DTSA provides that mere *acquisition* can constitute misappropriation, even if the acquired trade secrets were not *used*.[125] The evidence was clear that the former Motorola employees stole much more than they used, so the extent of any R&D that Hytera actually avoided was significantly less than the cost to develop the entirety of Motorola's trade secrets.[126] And Motorola's expert used an inflated labor rate too.[127]

Hytera offered alternative calculations in the civil trial that addressed these errors. First, when the correct labor rate ($1,638 per staff month) was applied to Motorola's determination that the whole body of trade secrets would have required 18,433 staff months, the calculation of Hytera's avoided R&D reduced to $30.2 million.[128] Next, an internal Motorola business plan estimated that the total staffing required to launch a DMR product required just 7,920 staff months.[129] Applying that 7,920 staff months of work and the correct labor rate resulted in a

---

[121] Civil Dkt. 1100 at 15 ¶ 47.
[122] Civil Dkt. 1100 at 23–24 (¶¶ 79–83).
[123] Civil Dkt. 1100 at 23 (¶ 79).
[124] *See* Section III.C.2, *supra*.
[125] 18 U.S.C. § 1839(5).
[126] Indeed, Motorola's calculations were severely inflated because they included the time both developing the technology for an older product *and* adapting it to the DMR context. *See* Civil Trial Tr. (Malackowski) at 2023:20–25.
[127] *See* Civil Trial Tr. (Aron) at 4857:15–4863:13.
[128] Civil Trial Tr. (Aron) at 4858:11–18.
[129] Ex. 10, DTX-4715 at 60.

calculation of $12.97 million in avoided R&D.[130] Hytera's expert estimated that the benefit Hytera gained was just the avoidance of 699 staff months, which, applying the correct labor rate, resulted in a calculation of $1.14 million in avoided R&D.[131]

### B. Contrary to Paragraph 132 of the PSR, Imposing a Fine Greater Than $5 Million Would Violate the Ex Post Facto Clause

Prior to the effective date of the DTSA on May 11, 2016, an organizational defendant convicted of 18 U.S.C. § 1832(a)(5) faced a maximum fine of $5 million.[132] The DTSA changed that provision to its current form, which provides the statutory maximum is "the greater of $5,000,000 or 3 times the value of the stolen trade secret to the organization, including expenses for research and design and other costs of reproducing the trade secret that the organization has thereby avoided."[133]

"The purpose of the ex post facto clause, among other things, is to prohibit a law that criminalizes or increases punishment for a crime after its commission."[134] Statutes enacted after a conspiracy has been completed therefore cannot increase the maximum punishment applicable to the offense.[135]

It is of course black-letter law that a "conspiracy ends when the design to commit substantive misconduct ends."[136] The conspiracy to which Hytera pled guilty was a conspiracy to

---

[130] Civil Trial Tr. (Aron) at 4864:7–16; Ex. 1, Grimmett Rpt. § VIII.C.5.

[131] Civil Trial Tr. (Grimmett) at 4328:7–24; *see also, e.g.*, Civil Trial Tr. (Grimmett) 4400:15–4401:10; Ex. 1, Grimmett Rpt. § VIII.C.5 & Appx. 2, § XIV.D.

[132] 18 U.S.C. § 1832(b) (2012) ("Any organization that commits any offense described in subsection (a) shall be fined not more than $5,000,000.").

[133] Defend Trade Secrets Act of 2016, Pub. L. No. 114-153, § 3, 130 Stat. 376, 382.

[134] *United States v. Couch*, 28 F.3d 711, 714 (7th Cir. 1994).

[135] *Cf. Couch*, 28 F.3d at 715 ("It is well settled that the ex post facto clause is not applicable to offenses which began before the effective date of a statute *and continue thereafter*." (emphasis added) (citation omitted)).

[136] *Midwest Grinding Co. v. Spitz*, 976 F.2d 1016, 1024 (7th Cir. 1992); *see also Grunewald v. United States*, 353 U.S. 391, 405 (1957) (conspiracy ends "after the central criminal purpose has been accomplished") (citation omitted).

steal certain Motorola information and use some of that information to develop a DMR product; that conspiracy therefore ended, at the latest, when Hytera launched a DMR product in 2010.[137] This means that the PSR's conclusion "that there is no ex-post facto violation . . . because the conspiracy alleged in this case indeed extended beyond the aforesaid 2016 statutory fine" is incorrect.[138]

Relatedly, it is not true that Hytera "pled guilty to the charge as alleged" in the Indictment. PSR ¶ 132. As a matter of law, a defendant that pleads guilty to a conspiracy charge does not admit that the beginning and ending dates alleged in the Indictment are correct.[139] At its plea colloquy, Hytera indicated that it was waiving its statute of limitations defense, but did not admit as a factual matter that the charged conspiracy existed past 2016.[140] Of course, a defendant that asserts its constitutional right to be sentenced pursuant to the laws that existed when the offense of conviction occurred is not asserting a statute-of-limitations defense, so Hytera's waiver of such a defense is no obstacle to its argument that, under the Ex Post Facto Clause, the maximum fine that can constitutionally be imposed is $5 million.

---

[137] *See* Ex. 221, Plea Agreement ¶ 6 ("In or around 2008, the individual co-defendants agreed to take, without authorization, certain Motorola documents and source code related to DMR technology and used some of that information to develop Hytera DMR products . . . . The individual co-defendants did so intending to convert at least one trade secret for Hytera's use in producing DMR products into interstate commerce, which Hytera ultimately did produce in or about 2010.").

[138] PSR ¶ 132.

[139] *See United States v. Paulette*, 858 F.3d 1055, 1059 (7th Cir. 2017) ("A plea of guilty admits only the essential elements of the offense. . . . The alleged beginning and ending dates of a charged conspiracy also are not elements of the crime.") (citation omitted).

[140] Dkt. 351 at 6:17–25 ("THE COURT: The third element is that one of the conspirators committed an overt act in an effort to advance the goals of the conspiracy on or after May 12, 2016? . . . MS. CANNON: So, Your Honor, by pleading guilty, Hytera is waiving . . . its defenses, excuse me, including to the statute of limitations."); *id.* at 7:3–5 ("THE COURT: All right. So you are waiving any affirmative defense of the statute of limitations? MS. CANNON: We are.").

### C.   Corrections to the PSR's Guidelines Calculations

1.   "Pecuniary Gain" Under the Guidelines Cannot Be Based on the Unjust Enrichment Award in the Civil Case

The PSR erred when it relied upon the $135.8 million compensatory award in the civil case to calculate "the pecuniary gain to the organization from the offense" under U.S.S.G. § 8C2.4(a)(2).[141] That compensatory award, as the Seventh Circuit has now recognized, was done without conducting the appropriate calculation of apportionment, and therefore cannot serve as a proxy for gain in this context.[142]

The term "pecuniary gain," as used in Chapter 8 of the Guidelines, "is derived from 18 U.S.C. § 3571(d)," which establishes an alternative maximum fine where "any person derives pecuniary gain from the offense."[143] Courts construing this statutory language have uniformly held that it incorporates a proximate cause requirement.[144]

That "pecuniary gain" under Chapter 8 of the Guidelines contains a proximate-cause requirement is significant, because according to the Seventh Circuit, Judge Norgle committed legal error by failing to consider proximate causation when calculating Hytera's unjust enrichment.[145] Apportionment of Hytera's profits by proximate cause would have required Judge Norgle to

---

[141] PSR ¶ 110.

[142] *Motorola Sols., Inc.*, 108 F.4th at 488.

[143] U.S.S.G. § 8A1.2 application note 3(H).

[144] *See, e.g.*, *United States v. BP Prods. N. Am. Inc.*, 610 F. Supp. 2d 655, 687–88 (S.D. Tex. 2009) (Rosenthal, J.) ("The government argues that this court may consider only losses or gains that the offense of conviction proximately caused. . . . Construing § 3571(d) to require a proximate cause standard is consistent with the case law."); *United States v. Sanford Ltd.*, 878 F. Supp. 2d 137, 152 (D.D.C. 2012) (finding *BP Products* to be "instructive" and holding that § 3571(d) "requires that the government prove that a given monetary amount (either a gain or a loss) was proximately caused by the conduct of the charged offense").

[145] *Motorola Sols., Inc.*, 108 F.4th at 477–78 ("[T]he infringement might be a necessary cause of the profits without being a proximate cause of *all* of the profits. . . . [T]he district court erred by apparently closing the 'proximate-cause' track to Hytera."); *id.* at 489 ("As with copyright damages, the district court also erred in closing off to Hytera the proximate-cause track to support possible apportionment of DTSA damages.").

evaluate the extent to which Hytera's own contributions to its radios drove its profits.[146] The Seventh Circuit therefore concluded that "[t]he district court must reconsider apportionment under the proximate-cause standard on remand."[147]

Because "pecuniary gain" under the guidelines has a proximate cause requirement, and because the $135.8 million award of Hytera's profits in the civil case was not limited to Hytera's profits that were proximately caused by the offense, it would be legal error to equate the two amounts. The PSR's conclusion that the $135.8 million award can establish the base fine amount under Chapter 8 of the Guidelines[148]—as well as its conclusion that the $135.8 million award can establish the loss amount under Chapter 2 of the Guidelines[149]—should be rejected.

---

[146] *See id* at 477 ("Under the second 'proximate-cause' track, the defendant can attempt to show that 'its profits are not the natural and probable consequences of the infringement alone, but are also the result of other factors' under its own control. . . . To the extent those other causes stem from the defendant's own skill and effort, the defendant can profit from those without offending copyright law." (citation omitted)); *id.* at 489 ("Here, we apply the case law regarding proof of causation for apportionment of awards under the Copyright Act to the DTSA.").

[147] *Id.* at 478.This conclusion was limited to the award of unjust enrichment under the Copyright Act, but the same principles would apply to the unjust enrichment award under the DTSA. The Seventh Circuit concluded that Hytera had forfeited its apportionment argument with respect to the $135.8 million unjust enrichment award under DTSA. *Id.* at 494.

[148] PSR ¶ 110.

[149] PSR ¶¶ 105–06. Like "pecuniary gain" under Chapter 8, "loss" under Chapter 2 has a proximate causation requirement. U.S.S.G. § 2B1.1(b)(1)(C)(i) ("'Actual loss' means the reasonably foreseeable pecuniary harm that resulted from the offense."). Additionally, under Chapter 2 of the Guidelines, a defendant's gain can be used "as an alternative measure of loss only if there is a loss but it reasonably cannot be determined." U.S.S.G. § 2B1.1(b)(1)(B). As noted above, Motorola had invested millions of dollars in developing the DMR standard, but if Hytera had not launched a DMR product in 2010 or had done so with a lower-quality product, the DMR standard would have faltered to Motorola's detriment. Because Motorola may not have suffered any loss at all, Hytera's gain is not available under the Guidelines as "an alternative measure" for that potentially non-existent loss. *See United States v. Galbraith*, 20 F.3d 1054, 1060 (10th Cir. 1994) ("Because there was no actual or intended loss to victims in this case, gain to the defendant cannot be used as an alternative estimate of loss.").

2.    The PSR's Obstruction of Justice Enhancement to Hytera's Culpability Score Is Inappropriate

The PSR adds three points to Hytera's culpability score based on alleged obstruction of justice under U.S.S.G. § 8C2.5(e).[150] The PSR based this enhancement on dicta found in the procedural-background section of the Seventh Circuit's decision in the appeal of the civil case, which described allegations of litigation misconduct during the civil suit.[151] According to the PSR's reading of that opinion, "the Seventh Circuit Court of Appeals has determined that Hytera deleted evidence, fabricated evidence, and produced witnesses which contradicted themselves at depositions and trial."[152] The PSR concludes that this alleged conduct justifies imposition of a three-point increase to Hytera's culpability score under 8C2.5(e).

But as described above—and in prior briefing before this Court—dicta from court decisions is not tantamount to judicial notice of facts.[153] Hytera acknowledged that its employees committed a theft and thus it did not contest liability on appeal. But its decision not to engage in a full-throated debate of every underlying fact dispute from trial never meant that it conceded the accuracy of Motorola's overall narrative,[154] which the Seventh Circuit unfortunately recited in dicta, and which has only snowballed with time.

Further, even if the Seventh Circuit's dicta could be interpreted as a reliable "finding," it still cannot, as a legal matter, justify an enhancement under U.S.S.G. § 8C2.5(e).

---

[150] PSR ¶118.

[151] *Motorola Sols., Inc.*, 108 F.4th at 472.

[152] PSR ¶ 118.

[153] *See* Dkt. 320 at 6 ("The charge that Hytera knowingly propounded false testimony in a civil case against the alleged victim here is highly inflammatory, and simply not consistent with the statements from the government's own star witness.").

[154] *See, e.g.*, Hytera's Combined Reply and Cross-Appeal Response at 56–59, Case Nos. 22-2370 & 22-2413 (7th Cir. May 1, 2020), Dkt. 31.

To begin, U.S.S.G. § 8C2.5(e) applies only when obstruction occurs "during the investigation, prosecution, or sentencing of the instant offense," such as "where a corporate officer commits perjury when testifying before a grand jury."[155] Without some connection between the civil litigation and the offense of conviction, misconduct in civil litigation does not suffice. Additionally, and critically here, the Seventh Circuit's opinion does not distinguish between purported misconduct that the indicted individual employees engaged in to protect *themselves*, from misconduct designed to protect Hytera as a corporation.[156] Nor does it credit Hytera's efforts to uncover that misconduct and bring it to light during civil discovery.[157]

Similarly, as a substantive matter, the Seventh Circuit's discussion of "witnesses which contradicted themselves at depositions and trial," "deleted evidence," and "fabricated evidence"[158] falls far short of what is required to establish obstruction of justice under the Guidelines. Application note 4(B) to U.S.S.G. § 3C1.1 states that an obstruction-of-justice enhancement can be based on subordination of perjury "during the course of a civil proceeding if such perjury pertains to conduct that forms the basis of the offense of conviction." But the statement that "witnesses have repeatedly contradicted themselves in depositions and at trial"[159] does not mean: (i) that the witnesses committed perjury; (ii) that Hytera suborned perjury; or (iii) that any perjurious testimony involved the offense of conviction in this case as opposed to a collateral matter or an issue like damages that is particular to the civil case. Nor was any perjury ever shown

---

[155] *See United States v. Bros. Const. Co. of Ohio*, 219 F.3d 300, 317 n.9 (4th Cir. 2000).
[156] *See* U.S.S.G. § 8C2.5 application note 9 ("Subsection (e) applies where the obstruction is committed on behalf of the organization; it does not apply where an individual or individuals have attempted to conceal their misconduct from the organization.").
[157] Def. Ver. at 26–28.
[158] PSR ¶ 118.
[159] *Motorola Sols., Inc.*, 108 F.4th at 472.

to have occurred.[160] Similarly, the Seventh Circuit's contention that spoliation occurred—i.e., that Hytera "deleted stolen documents rather than producing them,"[161]—is not the same as "destroying or concealing . . . evidence that is material to an official investigation or judicial proceeding."[162] And such a contention again fails to distinguish between conduct the indicted individuals engaged in to protect themselves as opposed to Hytera. Likewise, even if Hytera "presented fabricated evidence inflating its research-and-development costs,"[163] as Motorola claimed and as the Seventh Circuit simply repeated (and which Hytera contests), that issue has nothing to do with the offense of conviction.

3.     There Is No Evidence that Hytera's Former CEO Participated in, Condoned, or Was Willfully Ignorant of the Offense

The PSR concludes that, under U.S.S.G. § 8C2.5(a)(2)(A)(i), Hytera's culpability score should be increased by four points because Hytera's former CEO "either participated in, condoned, or was willfully ignorant of the offense."[164] The only basis for that conclusion is language in Judge Pacold's H-Series Order stating that Hytera's "President and CEO Chen Qingzhou personally negotiated with a Motorola engineer, convincing him to leave Motorola and join Hytera."[165] That portion of Judge Pacold's ruling was in turn drawn from Judge Norgle's "Findings of Fact and

---

[160] The only witness shown to have committed perjury is GS Kok, the government's lead cooperating witness, who has admitted giving false testimony during the ITC proceeding. ECF 78 (GS Kok Plea Agreement) at 7–8.

[161] 108 F.4th at 472.

[162] U.S.S.G. § 3C1.1 application note 4(D); *see also United States v. Gibson*, 409 F.3d 325, 341 (6th Cir. 2005) (concluding that U.S.S.G. § 8C2.5(e) did not apply even though the defendant "falsified its pre-shift and on-shift reports" because "the adjustment is meant to address more egregious behavior than that at issue here").

[163] 108 F.4th at 472.

[164] PSR ¶ 113.

[165] Civil Dkt. 1899 at 1; PSR ¶ 118 (concluding that Chen was involved "[g]iven this language" from "Judge Pacold's memorandum opinion and order").

32

Conclusions of Law" and the Seventh Circuit's Opinion,[166] as no issue related to the facts of the underlying theft have ever been presented to her for decision.

While Hytera has never contested that Chen was involved in negotiating with G.S. Kok over the potential terms of his employment, it has strenuously contested the sinister gloss applied by the government and Motorola. As Hytera explained in its version of the offense, "the arms-length, six-month period of negotiations between GS and Chen," during which "Chen ultimately rejected every single term of GS's" initial demands concerning salary and employment terms, "are not the negotiations of a company that had 'turned to crime.'"[167] Hytera respectfully submits that the mere fact that Chen engaged in hard-nosed negotiations with G.S. Kok is a normal part of running a company, not evidence that Chen "participated in, condoned, knew of, or was willfully ignorant of" G.S. Kok's future criminal scheme.

### D.    *The Guidelines Fine Range Should Be $98,000 to $196,000*

As described below, attempting to determine the base fine amount by reference to Motorola's pecuniary loss or Hytera's pecuniary gain "would unduly complicate or prolong the sentencing process,"[168] so the base fine amount must instead be calculated by reference to the table at U.S.S.G. § 8C2.4(d). That base fine amount, coupled with Hytera's correct culpability score—which is 7—produces a fine range of $98,000 to $196,000.

>    1.    Attempting to Use Motorola's Lost Profits as the Base Fine Amount Implicates the Complexity Exception to U.S.S.G. § 8C2.4(c)

The Guidelines state that "to the extent the calculation of either pecuniary gain or pecuniary loss would unduly complicate or prolong the sentencing process, that amount, i.e., gain or loss as

---

[166] Civil Dkt. 1899 at 1, citing Civil. Dkt. 1100 and the Seventh Circuit's July 2, 2024 Opinion.
[167] Def. Ver. at 16–17.
[168] U.S.S.G. § 8C2.4(c).

appropriate, shall not be used for the determination of the base fine."[169] For instance, in *United States v. Gibson*, 409 F.3d 325 (6th Cir. 2005), the district court applied U.S.S.G. § 8C2.4(c)'s complexity exception—and an identically worded complexity provision found in 18 U.S.C. § 3571(d)—to reject the government's attempt to introduce evidence about a corporate defendant's gain.[170] The district court instead used the base fine amount listed in the U.S.S.G. § 8C2.4(d).[171] As discussed above,[172] attempting to establish Motorola's lost profits would effectively turn sentencing into a weeks-long bench trial about whether anything the indicted individuals stole amounted to a trade secret, whether any of those trade secrets were used in Hytera's radios and relevant to Motorola's customers' purchasing decisions, and what Hytera's own contributions to its DMR radio were, so the complexity exception would apply.

> 2. Attempting to Use Hytera's Gain as the Base Fine Amount Would Also Implicate the Complexity Exception

As a general matter, a defendant's pecuniary gain from the offense can be used to set the base fine amount[173] but that option is not available here. In this context, pecuniary gain "means the additional before-tax profit to the defendant resulting from the relevant conduct of the offense" and "can result from either additional revenue or cost savings."[174] Establishing pecuniary gain requires "the government [to] prove that a given monetary amount . . . was proximately caused by

---

[169] U.S.S.G. § 8C2.4(c).

[170] 409 F.3d at 331 (citing U.S.S.G. § 8C2.4); *id.* at 342 (quoting 18 U.S.C. § 3571(d)).

[171] 409 F.3d at 342; *see also BP Prods. N. Am. Inc.*, 610 F. Supp. 2d at 699 ("Attempting to use the total plant profits as the basis for the fine would 'unduly complicate and prolong' the sentencing process . . . .") (citation omitted); *id.* at 700 (basing fine on plant's cost savings would also "be unduly complicated and prolonged, triggering the complexity provision"); *United States v. CITGO Petroleum Corp.*, 908 F. Supp. 2d 812, 818 (S.D. Tex. 2012).

[172] *See supra* Sections III.D–F.

[173] U.S.S.G. § 8C2.4(a)(2).

[174] U.S.S.G. § 8A1.2 application note 3(H).

the conduct" underlying an offense.[175] The government has not tried to do this. This proximate-cause requirement means that not all profits realized by Hytera from selling radios developed using some Motorola information qualify as "pecuniary gain" under the Guidelines, since any profits which "stem from the defendant's own skill and effort" are not proximately caused by the infringement.[176] It would require an apportionment analysis, which has never been done, to consider important factors like price, brand loyalty, or Hytera's own contributions to its radios.[177] Again, the complexity exception should apply here as well, as this analysis "would unduly complicate or prolong the sentencing process."[178]

> 3.      Under U.S.S.G. § 8C2.4(a)(1), the Base Fine Amount Is $70,000

Because the base fine amount cannot be determined via pecuniary gain or pecuniary loss, U.S.S.G. § 8C2.4(a)(1) indicates that the base fine amount should be determined by consulting the table found at U.S.S.G. § 8C2.5(d), which lists base fine amounts corresponding to various offense levels. Here, the base offense level is 6[179] which is then increased to 12 because the offense was

---

[175] *Sanford Ltd.*, 878 F. Supp. 2d at 152 (construing "gross gain" under 18 U.S.C. § 3571(d) to require proximate cause); *see also* U.S.S.G. § 8A1.2 application note 3(H) (explaining that pecuniary gain under the Guidelines "is derived from 18 U.S.C. § 3571(d)").

[176] *Motorola Sols., Inc.*, 108 F.4th at 477.

[177] Ex. 8, Bilgicer Rpt. §§ V.A–D; Ex. 1, Grimmett Rpt. ¶¶ 86–88, 94, 101–106; Trial Tr. (Grimmett) at 4332:16–4334:10.

[178] U.S.S.G. § 8C2.4(c). While gain could theoretically be established by considering whether an offense allowed a defendant to realize any cost savings—which would not be "subject to apportionment" based on proximate cause, 108 F.4th at 489—the government has made no attempt to quantify any such cost savings. And any attempt to fill that evidentiary void by relying on findings from the civil case regarding how much it would have cost Hytera to develop the trade secrets at issue would be inappropriate, since the government purports to allege different trade secrets here. Compare Indictment at 6–7 (listing trade secrets), with Civil Dkt. 1100 at 10–11 (¶ 33) (listing trade secrets at issue in the civil case). Accordingly, there is no evidentiary basis to quantify Hytera's cost savings from the theft of any so-called "trade secrets," so the base fine cannot be based on Hytera's pecuniary gain. *See also* Ex. 8, Bilgicer Rpt. § V.F (explaining how Malackowski's lost profit damages calculations ignore the complications of a proper calculation).

[179] U.S.S.G. § 2B1.1(a)(2).

committed outside the U.S.[180] The resulting offense level, 12, corresponds to a base fine amount of $70,000 pursuant to the U.S.S.G. § 8C2.4(d) table.

4.    Hytera's Correct Culpability Score is 7

The PSR is correct insofar as it identifies the starting culpability score as 5 and concludes that a one-point reduction for acceptance of responsibility is appropriate.[181] But as explained above, the PSR is incorrect when it suggests a four-point increase is appropriate under U.S.S.G. § 8C2.5(b) because Hytera's former CEO was not involved in the offense.

Instead, a three-point increase in Hytera's culpability score is appropriate.[182] While G.S. Kok himself unquestionably "participated" in the offense—indeed, he was the ringleader—per Hytera's 2011 prospectus, G.S. Kok was hired in 2008 "as deputy director of DMR [at Hytera's] Shenzhen Research and Development Center."[183] That would make him high-level personnel of Hytera's R&D department, but not high-level personnel of the entire company.[184] If G.S. Kok were considered to be high-level personnel of the R&D department when the offense occurred, that would be sufficient to impose a three-point increase under U.S.S.G. § 8C2.5(b)(3)(B), which applies if the unit of the organization had more than 200 but less than 1,000 employees.[185] That

---

[180] U.S.S.G. § 2B1.1(b)(10)(B).

[181] PSR ¶¶ 111, 120.

[182] See U.S.S.G. § 8C2.5(b)(3) ("If . . . the unit of the organization within which the offense was committed had 200 or more employees and . . . an individual within high-level personnel of the unit participated in, condoned, or was willfully ignorant of the offense . . . add 3 points . . . .").

[183] Ex. 11, PTX-2380.620; see also Ex. 11, PTX-2380.485–90 (listing 12 other employees with a "Deputy Director" job title).

[184] Compare U.S.S.G. § 8C2.5 application note 3 ("With respect to a unit with 200 or more employees, 'high-level personnel of a unit of the organization' means agents within the unit who set the policy for or control that unit."), with U.S.S.G. § 8A1.2 application note 3(B) ("High-level personnel of the organization" means individuals who have substantial control over the organization or who have a substantial role in the making of policy within the organization. The term includes: a director; an executive officer; an individual in charge of a major business or functional unit of the organization, such as sales, administration, or finance; and an individual with a substantial ownership interest.").

[185] See Ex. 11, PTX-2380.493 (showing that Hytera's research-and-development department had 772 employees in all sections as of 2010).

three-point increase, together with a base culpability score of 5 and a one-point decrease for acceptance of responsibility produces a culpability score of 7.

5.    Hytera's Fine Range Is $98,000 to $196,000

Using the minimum and maximum multipliers listed in U.S.S.G. § 8C2.6, a base fine of $70,000 and a culpability score of 7 yields minimum and maximum multipliers of 1.40 and 2.80, producing a fine range of $98,000 to $196,000.

## V.    Application of the 18 U.S.C. § 3553 Sentencing Factors

The lodestar of criminal sentencing is that a defendant's punishment must be "sufficient, but not greater than necessary."[186] Hytera has already been punished far beyond any gain it realized or loss Motorola suffered, and indeed, far beyond the punishment any corporate defendant has ever received following a theft of trade secrets conviction. This is more than sufficient. Accordingly, the factors the Court must consider under Section 3553 point towards one conclusion—there is no need to punish Hytera further. Draconian remedies already will follow should Hytera fail to meet its sentencing obligations, including that Hytera's Plea Agreement allows the government to move to vacate any sentence and re-sentence Hytera *without any fine limit*.[187] Nothing more is necessary to either punish Hytera or police it.

### A.    *History and Characteristics of the Defendant (Section 3553 (a)(1))*

As the PSR makes clear, Hytera has no criminal record, and the crime committed by the indicted Hytera employees is an aberration.[188] Instead, Hytera's history is remarkable—it is a company that sprung from nothing, grew quickly by hiring the best and brightest (from China's MIT-equivalent, the Harbin Institute of Technology), developed a wide range of mission critical

---

[186] 18 U.S.C. § 3553(a).
[187] ECF 353 (Plea Agreement) ¶ 33.
[188] PSR at 30.

radio products for first-responders around the world (more than ███ of its sales come from products other than DMR radios), and formed a world-class distribution system.[189] For nearly two decades, Hytera has invested heavily in research and development to deliver advanced radio solutions tailored to the needs of public safety agencies, utilities, transportation providers, and others throughout the world.[190] These systems include proprietary features such as emergency call prioritization, GPS-based distress alerts, and unique encryption technologies that enhance reliability and security.[191] Hytera's success has been recognized by a slew of organizations in China and throughout the rest of the world, including Fortune magazine, Forbes, and Deloitte & Touche, among others.[192]

And Hytera is not just a business success. It is also a good corporate citizen, developing life-saving support systems for first-responders and donating its services and products around the world. Hytera has also demonstrated a consistent commitment to social responsibility through a range of charitable initiatives and sustainability efforts.[193] As part of its evolution, Hytera has also become a leader in compliance among Chinese companies.[194] As discussed below, it has transformed its compliance program and IP training so that they are state-of-the-art.

### B. *Protecting The Public from Further Crimes of the Defendant (Section 3553(a)(2)(C))*

Hytera has learned an extraordinarily painful lesson about the importance of compliance and monitoring—and Hytera is determined that it will never face this situation again. The costs to Hytera from the actions of the indicted Hytera employees are staggering—over half-a-billion

---

[189] Def. Ver. at 2–5, 32–34.
[190] *Id.* at 32–34.
[191] *Id.*
[192] *Id.* at 3.
[193] *See, e.g., Sustainability and Corporate Social Responsibility*, Hytera, https://www.hytera.com/Global_Sites_en_AE/about-hytera/sustainability.page (last visited Nov. 3, 2025).
[194] Def. Ver. at 37–47.

dollars ($551M) in punitive and compensatory damages, interest, attorneys' fees, and royalties. Hytera earned approximately $524 million in revenue in 2024—the $551 million in judgment-related obligations it faces are unquestionably a massive blow to the financial health of the company and its shareholders. But even that $551 million figure seriously understates the true costs to Hytera, for it does not include:

- The tens of millions in litigation costs that Hytera has incurred—and will continue to incur—in defending itself;

- The tens of millions that Hytera spent designing the H-Series radios in an effort to avoid using any of Motorola's trade secrets, or the millions more that Hytera may pay in royalties for that product;

- The time and energy costs of having its personnel and senior leadership constantly addressing these legal matters;

- The transaction costs associated with Motorola and the government's constant drumbeat of litigation (e.g., added bank fees, higher interest rates, reputational costs, etc.); and

- The loss of profits stemming from Hytera's inability to invest in R&D as it had, or sell its products in the United States market.

These costs far exceed any conceivable benefit to Hytera. The goal of specific deterrence has been met.

### C.    *Need to Avoid Unwarranted Sentence Disparities (Section 3553(a)(6))*

Section 3553(a)(6) commands that the Court avoid unwarranted sentence disparities. A comparison with other companies convicted of trade secret theft shows that Hytera has already been punished much more than any other comparable defendant. In fact, the $271.6 million punitive damages award that Hytera owes dwarfs the largest fines ordered in any criminal trade

secrets case—indeed it is larger than the *combined* four highest fines ever imposed against companies in criminal trade secret cases.[195]

Hytera's punishment thus far exceeds—both in absolute terms and relative to the amount of restitution at issue—punishments handed out for similar conduct. Accordingly, this factor weighs in favor of imposing no further fine on Hytera.

### D. Affording Adequate Deterrence to Criminal Conduct (Section 3553(a)(2)(B))

No person or company could look at what has happened to Hytera and conclude that it would be worthwhile to steal trade secrets. Motorola has also ensured that the news of the civil judgments and subsequent litigation orders are known far and wide.[196] There are no more headlines or punishments needed to proselytize that message. The goal of general deterrence has been met here as well.

### E. Need to Provide Restitution (Section 3553(a)(7))

Hytera is already compensating Motorola for damages Motorola suffered in the civil case. Indeed, Motorola will receive millions more than the $174 million it claims it lost[197] courtesy of the $271.6 million punitive award. As a result, and as set forth below, there is no need for additional

---

[195] *See* Judgment, *United States v. Siemens Energy, Inc.,* No. 3:24-cr-00141 (E.D. Va., Dec. 5, 2025), Dkt. 24 (imposing $104 million fine against German company where theft of trade secrets led to wire fraud conspiracy conviction); Minutes Entry, *United States v. United Microelectronics Corp.*, No. 18-CR-465 (N.D. Cal., Oct. 28, 2020), Dkt. 150 (imposing $60 million fine for Taiwanese company convicted of conspiracy to steal trade secrets); Indictment, *United Microelectronics Corp.* (Sept. 27, 2018), Dkt. 1; Minute Entry, *United States v. Sinovel Wind Grp.*, No. 3:13-CR-00084 (W.D. Wisc., July 6, 2018), Dkt. 497 (imposing $1.5 million fine and $58,350,000 restitution judgment against Chinese company convicted of trade secret theft); Judgment, *United States v. Kolon Indus.*, No. 3:12-CR-00137-001 (E.D. Va., May 1, 2015), Dkt. 196 (imposing $85 million fine and $275 million in restitution against South Korean company convicted of trade secret theft).

[196] *See, e.g.*, ECF 321.

[197] VIS at 30. To the extent Motorola's request The other components of the judgment in the civil case, including DTSA compensatory damages of $135.8 million, fees, costs, and pre- and post-judgment interest, all total at least $490 million—more than

restitution in the criminal case, particularly given the complexity of the issues that would need to be litigated for the first time if the Court were to impose a separate criminal restitution order.

### F. Seriousness of the Offense, Respect for the Law, and Providing Just Punishment (Section 3553(a)(2)(A))

Hytera appreciates that the crime the seven Hytera employees committed was serious, and understands that it is legally responsible for their acts. But as Hytera's civil punishment is already more severe than the harshest penalties ever ordered for a criminal violation of 18 U.S.C. § 1832, any sentence imposed here, even one focused on ensuring payment of the existing judgment rather than imposing new fines, will promote respect for the law and provide a just punishment.

## VI. Motorola Is Not Entitled to Restitution

The Court should decline to award any restitution, let alone the $288,615,969 sought by the government.[198] As an initial matter, the PSR correctly concluded that "restitution is not applicable" due to the complexity exceptions and in light of the "massive civil judgment" in favor of Motorola.[199] Further, the MVRA does not permit lost profits to be awarded as restitution in property-crime cases[200] nor prejudgment interest to be awarded here.[201] Finally, as discussed above[202], the government cannot substantiate the $174,400,466 it seeks based on Motorola's lost profits.[203]

---

[198] Motorola also seeks an additional $2,183,383.30 in restitution for costs it alleges it incurred relating to the criminal case prosecution. VIS at 32. Motorola provided its support for the alleged fees and costs on October 31 and November 3, which has not given Hytera time to respond in this November 3 filing. Hytera will oppose this request—the information that Motorola provided does not appear sufficient to support an award of attorney's fees. *See United States v. Steele*, 897 F.3d 606, 613 (4th Cir. 2018) ("We have held that a victim's unsupported loss estimate was insufficient, on its own, to substantiate a restitution amount."). Hytera will respond to Motorola's request in a supplemental filing.

[199] *See* 18 U.S.C. § 3663A(c)(3)(B) and U.S.S.G. § 5E1.1(b)(2)(B); PSR ¶¶ 140–143 (citing same); Def. Ver. at 63–64.

[200] Def. Ver. at 69–71.

[201] Def. Ver. at 48–49.

[202] *See supra* Section D.

[203] G. Ver., Ex. MM at 4.

### A.    The MVRA's Complexity Exception Applies

As Probation correctly found, restitution is inappropriate here because the MVRA does not provide for restitution where "determining complex issues of fact related to the cause or amount of the victim's losses would complicate or prolong the sentencing process to a degree that the need to provide restitution to any victim is outweighed by the burden on the sentencing process."[204]

The MVRA's "complexity exception requires a balancing test: to determine whether it applies, a court 'must weigh the need to provide restitution to a victim against the burden on the sentencing process posed by determining complex issues of fact.'"[205] Here, both sides of the equation weigh against awarding restitution because there is both no need to provide further restitution and a burdensome procedure to even try.

As the Probation Officer noted, Motorola will be made whole regardless of whether restitution is imposed.[206] Courts have found the complexity exception applicable based in part on just the *possibility* of civil proceedings providing repayment—the existing civil judgment, of which Hytera has paid over $100 million, makes this an even more compelling case.[207]

---

[204] 18 U.S.C. § 3663A(c)(3)(B); PSR ¶¶ 140–143; Def. Ver. at 63–64.

[205] *United States v. Betts*, 99 F.4th 1048, 1061 (7th Cir. 2024) (quoting *United States v. Malone*, 747 F.3d 481, 486 (7th Cir. 2014)); *accord United States v. Oslund*, 453 F.3d 1048, 1063 (8th Cir. 2006) ("We agree with the Seventh Circuit that a burdensome, complicated, or speculative calculation provides a good reason for the district court to decline to exercise its discretion in favor of including future lost income in a restitution order.").

[206] PSR Rec. at 2 (noting that "massive civil judgment has been imposed, and that civil enforcement of that judgment will ensure that the victim of this offense is compensated for the hardships resulting from the instant offense.").

[207] *see also United States v. Gallant*, 537 F.3d 1202, 1254 (10th Cir. 2008) (finding that the complexity exception applied in part because it was possible that FDIC's then-ongoing civil suit might provide compensation outside of the criminal case); *see United States v. Malone*, 747 F.3d 481, 486 (7th Cir. 2014) (court could properly consider "the existence of a separate civil suit involving the defendant" because "[s]uch a suit . . . could conceivably lessen the 'need to provide restitution to any victim' in the criminal proceeding because relief may be available in the civil proceeding." *Id.* (citation omitted); *see also Gallant*, 537 F.3d at 1254 ("While the availability of other relief is deemed irrelevant to the process of calculating the *amount* of a restitution award, it is not necessarily irrelevant to the *availability* of such an award under § 3663A."); *United States v. Serawop*, 505 F.3d 1112, 1124 (10th Cir. 2007) (commenting that the district

And on the other side of the balance, as the Probation Officer observed, any restitution hearing "would be onerous and extremely complex."[208] The point of the complexity exception is to avoid such a result. "Congress plainly intended that sentencing courts not become embroiled in intricate issues of proof," and the complexity exception "reflects Congress's intention that the process of deter-mining an appropriate order of restitution be 'streamlined,' and that the restitution 'determination be made quickly.'"[209]

As discussed above, the government has failed to make the necessary factual and legal showings to prove Motorola's lost profits, even assuming they are relevant. Identifying the pertinent trade secrets and then quantifying Motorola's lost profits related to those trade secrets would require the Court to engage in a lengthy sentencing hearing with exactly the sort of "intricate issues of proof" that *Reifler* warned against.[210] The Court should decline any such invitation.

### B. Lost Profits Are Not Available as Restitution for Property Offenses Under the MVRA

Even if the complexity exception did not apply, Motorola would still not be entitled to restitution because lost profits are not available for property crimes under the MVRA. Trade secret theft [a chapter 90 offense] is an offence against property—not bodily injury to a person—which is a critical distinction.[211] The MVRA allows "income lost by" the victim to be awarded only "in the case of an offense resulting in bodily injury to a victim," but *not* "in the case of an offense

---

court "certainly ha[s] been on firm ground, noting the time and complexity of its subsequent proceedings, to have left such complex matters to a civil determination").

[208] PSR Rec. at 2.

[209] *United States v. Reifler*, 446 F.3d 65, 136 (2d Cir. 2006) (citations omitted) (quoting S. Rep. No. 104–179 at 20-21 (1995), *reprinted in* 1996 U.S.C.C.A.N. at 933–34); *accord Oslund*, 453 F.3d at 1063 ("We agree with the Seventh Circuit that a burdensome, complicated, or speculative calculation provides a good reason for the district court to decline to exercise its discretion in favor of including future lost income in a restitution order.").

[210] *See, e.g.*, Ex. 2, Cooklev Rpt. § XII; Ex. 1, Grimmett Rpt. VIII.B; Ex. 8, Bilgicer Rpt. § V.

[211] 18 U.S.C. § 2323(c).

resulting in damage to or loss or destruction of property."[212] As a result, the "measure of relief [permitted by the MVRA] is less generous than common law damages, since it does not extend to consequences beyond the diminution of the value of the property stolen or damaged, consequences that could easily exceed that diminution."[213]

Further, the MVRA does not generally permit awards of prejudgment interest—such as the $114,215,523 in interest the government seeks. Instead, prejudgment interest can be awarded as restitution only where it could be considered to be part of "the value of the property" damaged, lost, or destroyed,[214] such as where a defendant fraudulently incurs credit-card charges and the victim is required to pay credit-card interest,[215] or where stolen "money came from an interest-bearing account."[216] Prejudgment interest is not part of the value of Motorola's trade secrets, and thus cannot be part of any restitution award.

---

[212] *Compare* 18 U.S.C. § 3663A(b)(2) *with* 18 U.S.C. § 3663A(b)(1).

[213] *United States v. Scott*, 405 F.3d 615, 618 (7th Cir. 2005)(citation omitted); *accord United States v. McCormack*, 152 F.4th 428, 430–31 (3d Cir. 2025) ("And lost sales . . . are consequential damages not covered by the MVRA. . . . As the government concedes, the District Court should not have compensated the gun store owners for their lost income.")(citation omitted); *United States v. Buchanan*, Nos. 22-3301/3697, 2023 WL 5352223, at *9 (6th Cir. Aug. 21, 2023) ("Because the [MVRA] does not provide for the recovery of lost income for offenses resulting in property damage, the district court's restitution order including lost potential income during the time period the store was closed for repairs was in error."); *United States v. Mitchell*, 876 F.2d 1178, 1183 (5th Cir. 1989) ("Congress is clearly capable of authorizing restitution for lost income when it chooses to do so. Despite this fact, it has not included lost income in the type of restitution that may be ordered in property cases and, unless and until it amends the statute to include lost income, courts may not order such restitution in property cases." (citation omitted)); *United States v. Sharp*, 927 F.2d 170, 174 (4th Cir. 1991); *United States v. Arvanitis*, 902 F.2d 489, 497 (7th Cir. 1990).

*Mitchell*, *Sharp*, and *Arvanitis* predate the MVRA and instead construe its predecessor, the Victim and Witness Protection Act of 1982, but the Seventh Circuit has recognized that "the VWPA and the MVRA are nearly identical in authorizing an award of restitution" such that "court decision in interpreting the language of the VWPA are helpful in construing the language of the MVRA." *Betts*, 99 F.4th at 1061 n.4 (quoting *United States v. Randle*, 324 F.3d 550, 555 n.2, 556 n.3 (7th Cir. 2003)).

[214] 18 U.S.C. § 3663A(b)(1).

[215] *United States v. Rutley*, 482 F. App'x 175, 178 (7th Cir. 2012).

[216] *United States v. Shepard*, 269 F.3d 884, 886 (7th Cir. 2001).

VII. **Hytera Should Not Be Ordered to Pay Financial Obligations Beyond Its Ability to Pay**

In considering a possible fine, as well any payment schedule and interest due on fine or restitution awards, this Court must consider Hytera's ability to pay. This is a critical consideration here—as a company with $524 million in annual revenue, it will take time to pay Hytera's existing $371 million obligation to Motorola. Hytera simply does not have unlimited funds to satisfy multiple awards across both cases. The parties have agreed in the Plea Agreement (to recommend a probation term of five years. This term was intentional—Hytera anticipates that it will need five years to pay down its existing obligations.

A. *The Court Must Consider Hytera's Ability to Pay in Setting Any Fine*

Hytera cannot pay a significant fine or additional restitution beyond the civil judgment. The Court must consider this fact in its sentence and prioritize the payment of restitution and/or the civil award over imposing an additional fine.[217]

Additionally, the Guidelines indicate that a fine should not be imposed if it would "substantially jeopardize the continued existence of the organization."[218]

B. *Hytera Cannot Promise to Pay More Than* ▮▮▮▮▮▮▮▮▮ *to Motorola*

Imposing a significant fine, or an expedited payment schedule, will both "impair the ability" of Hytera to make restitution at all, and "substantially jeopardize" Hytera's continued existence. This is not mere posturing—Hytera has been involved in an ongoing dispute with

---

[217] *See* 18 U.S.C. § 3572(b) ("If, as a result of a conviction, the defendant has the obligation to make restitution to a victim of the offense, other than the United States, the court shall impose a fine or other monetary penalty only to the extent that such fine or penalty will not impair the ability of the defendant to make restitution."); *see also* U.S.S.G. § 8C3.3(a) ("The court shall reduce the fine below that otherwise required . . . to the extent that imposition of such fine would impair the ability of the organization to make restitution to victims.").

[218] U.S.S.G. § 8C3.3 application note 1 (specifying when an organization is not able to pay a fine); *see also* U.S.S.G. § 8C3.3(b) ("The court may impose a fine below that otherwise required . . . if the court finds that the organization is not able and, even with the use of a reasonable installment schedule, is not likely to become able to pay the minimum fine required . . . .").

Motorola in the civil case about the limits of its ability to pay. In that context, Hytera has shown the outer limits of what it can pay and when, and those limits apply with equal force here.

In the civil case, Motorola has demanded Hytera pay its entire obligation immediately, albeit without explaining how Hytera could do so. Hytera has repeatedly explained that this would pose a liquidity crisis, but has also laid out a payment plan that requires Hytera to pay all of its "free cash," or basically the money that is not needed to continue Hytera's business operations. Hytera's best calculation, based on its past performance and predictions as to its business going forward, is that it can pay a minimum of ███████████ towards satisfying the civil awards.[219] This calculation is based on the sworn testimony of Hytera's Financial Director, Jiliang Kang, and was reviewed and approved by Hong Qiao, an expert accounting expert from Charles River Associates.[220] Requiring more of Hytera will jeopardize its ability to operate as a going concern, which is how it generates revenue to pay down the judgment.[221]

In light of accruing interest and the ongoing disruption to its operations, it is in Hytera's best interest to pay the civil awards as quickly as it can. And indeed, as noted above, Hytera has paid over $103 million this year towards the compensatory award so far.[222] Those payments demonstrate Hytera's willingness to pay Motorola as it can.

Hytera's ability to pay Motorola is also, of course, subject to new developments and requirements in the civil case. For example, as a result of the civil court recently holding that

---

[219] Hytera anticipates generating, on a going forward basis, approximately ███ million in excess net cashflow from operations per year, but can commit to paying only ███ million because it will require the remaining excess net cashflow (if it reaches the anticipated annual targets) to repay bank debt (e.g., Hytera must pay ███ million per year for the next two years toward its outstanding bank loans, which total ███ million) and to pay additional royalties due Motorola on sales of H-Series DMR products, pending Hytera's appeal. Ex. 4, Civil Dkt. 1829 (Kang Decl.) ¶¶ 25, 57(c); Civil Dkt. 1826 (Qiao Decl.) ¶ 47.

[220] Ex. 4, Civil Dkt. 1829 (Kang Decl.) ¶¶ 26, 57(c); Civil Dkt. 1826 (Qiao Decl.) ¶ 47.

[221] Ex. 6, Civil Dkt. 1826 (Qiao Decl.) ¶ 78; Ex. 4, Dkt. 1829 (Kang Decl.) ¶ 28.

[222] Civil Dkt. 1916.

Hytera's redesigned H-Series DMR products are subject to the Royalty Order, Hytera has sought permission to place an additional ███ million into cash escrow for the royalties and interest due on those sales as security pending appeal.[223] To do so, Hytera had to take out loans from a third-party lender and from its subsidiaries to pull that cash together.[224]

### C. The Court Must Consider Hytera's Ability to Pay in Setting a Payment Schedule

The Court has the authority to order a payment plan in the "interest of justice" for any "fine or other monetary penalty, including restitution."[225] Any such payment plan should be set for the "shortest time in which full payment can reasonably be made."[226] Here, it is in the interest of justice that the Court establish a payment schedule for that commitment, as well as any other penalty, that allows Hytera a reasonable amount of time to comply.

Hytera can pay down its existing obligation to Motorola over the course of the next five years, as reflected on this schedule reflecting an annual payment of at least ███████████.

| Balance Currently Owed to Motorola | | $371.7 million | |
|---|---|---|---|
| **Payment Date** | | **Payment Amount** | **Remaining Balance** |
| ██████ | | ██████ | ██████ |
| ██████ | | ██████ | ██████ |
| ██████ | | ██████ | ██████ |
| ██████ | | ██████ | ██████ |
| ██████ | | Remaining Balance[227] | $0 |

This schedule demonstrates that Hytera can pay the outstanding civil judgment . But Hytera cannot pay significantly more, nor can Hytera necessarily pay that obligation

---

[223] Civil Dkts. 1921, 1947, 1959.

[224] *See* Ex. 17 (Oct. 14, 2025 Kang Decl.) ¶ 21.

[225] 18 U.S.C. § 3572(d)(1).

[226] 18 U.S.C. § 3572(d)(2).

[227] The precise amount of the remaining balance will depend on the rate of Hytera's payments, as post-judgment interest of approximately $4 million per year will continue to accrue (though less interest will accrue as payments are made).

more quickly. In fact, requiring a fine beyond the $10 million recommended by Probation[228] or restitution beyond what Hytera is currently paying in the civil suit will directly undermine Hytera's ability to meet its obligations to Motorola. Diverting funds to pay additional criminal fines or restitution would either delay satisfaction of the civil judgment or force Hytera into a quickly deteriorating financial situation—outcomes the law explicitly forbids.

### D. The Court Should Consider Hytera's Ability to Pay in Determining Whether to Impose Interest

Finally, the Court must also consider the ability of Hytera to pay interest on any fine or restitution order.[229] As explained above, Hytera cannot pay any fine until the end of its probation term, as it will take years to pay off the civil awards first. So, any fine interest requirement will accrue for at least four years because Hytera will be unable to pay it any sooner. As recognized by Section 3612(f), this would be unjust.

The same considerations apply with respect to interest on any restitution order (and as noted, the Court should not order restitution for the reasons outlined above). Further, interest on any restitution order would pose serious difficulties because of the competing and overlapping existing obligations in the civil case (which may have different interest rates and terms than the criminal case). Those civil interest payments remain a subject of litigation before Judge Pacold, and it would be double-counting for Hytera to have to pay interest on both awards. Again, Hytera is paying as much and as quickly as it can—it should not face these additional burdens.

## VIII. Motorola's Five Proposed Special Conditions of Probation Should Be Rejected.

The Probation Officer proposed that the Court order basic mandatory and standard conditions of probation, adding only one special condition of probation related to information

---

[228] PSR Rec. at 1.
[229] 18 U.S.C. § 3612(f) (permitting court to waive or otherwise modify interest payments on fine and restitution obligations when the defendant "does not have the ability to pay interest.").

sharing. That proposal is generally reasonable and consistent with the statutory framework that governs probation.[230]

In contrast, Motorola suggested a sweeping array of special conditions of probation, which are neither reasonable nor tethered to the statutory framework. As proposed special conditions of probation, Motorola asks that the Court require Hytera to: (1) remove and quarantine Motorola trade secret information; (2) be enjoined from sales of all products based on the theft of Motorola's trade secrets; (3) bring new products to the Court prior to first commercial sale to ensure they do not contain or are based on Motorola trade secret information; (4) publicize the conviction and sentencing; and (5) submit to additional conditions, including inspection of its books and records, until the Court's Judgment in this case is paid in full.[231]

These conditions are unnecessary. First, Motorola has already requested in the civil case the first three special conditions that it seeks here.[232] Those requests remain pending. Requiring such conditions here invites this Court to make either conflicting or redundant rulings.

Next, discretionary conditions of probation must be "reasonably related to the factors set forth in section 3553(a)(1) and (a)(2)" and must also "involve only such deprivations of liberty or property as are reasonably necessary for the purposes indicated in section 3553(a)(2)."[233].

---

[230] Hytera anticipates that it will agree with much of what the Probation Officer proposed for probation conditions, but there will likely need to be some adjustments in those terms to reflect that Hytera is a Chinese company with international operations (*e.g.*, Standard Condition #7, which requires the Probation Officer to approve any sale of any of Hytera's assets, which arguably could include Hytera's actual products, is overbroad). Hytera anticipates that it will discuss probation terms further with the government in an effort to reach agreement.

[231] VIS at 35–37.

[232] *See, e.g.*, Civil Dkt. 1806 at 1, 23.

[233] 18 U.S.C. § 3563(b); *see also* U.S.S.G. 8D1.3(c).

Retributive considerations may not be considered when setting special conditions.[234] The five discretionary conditions Motorola requests do not hew to these guideposts.

### A. Motorola's Requested Conditions Are Plainly Self-Interested

Motorola's requested conditions start from the false premise that "[t]he crime here is ongoing." But the crime to which Hytera pled guilty was committed nearly twenty years ago, and the conspiracy did not continue thereafter. Following the Civil Trial, Judge Norgle expressly permitted Hytera to continue selling the products at issue, conditioned on the payment of a royalty. Judge Norgle set that royalty at a rate representing 100% of Hytera's profits on those sales, which was far in excess of Motorola's "global average expected future lost profits" per unit.[235] Hytera has fully paid the grossly inflated royalties ordered by Judge Norgle.[236] Indeed, because the royalty rates exceeded Motorola's estimated loss, Hytera's sales have not injured Motorola at all, but rather resulted in a windfall.

Next, Motorola's arguments and recommendations must all be considered in light of its strong competitive self-interest in this case, which reaches far beyond seeking justice for any harm it suffered. Hytera's continued presence in the market serves critical public and consumer interests, and removing Hytera from the market would deprive thousands of governmental agencies, first responders, and others of essential tools.[237]

Hytera's absence would also harm consumers by reducing choice and reinforcing Motorola's near-monopoly in the emergency communications market. Motorola already controls

---

[234] *Esteras v. United States*, 145 S. Ct. 2031, 2041 (2025) ("We have twice interpreted the omission of § 3553(a)(2)(A) from the provision governing the imposition of supervised release (§ 3583(c)) to mean that district courts may not consider that factor when imposing supervised release.").

[235] Ex. 5, Civil Dkt. 1289 at 24.

[236] *See* Ex. 6, Civil Dkt. 1826 (Qiao Decl.) ¶ 43, Schedule 5.2 (summarizing royalty payments as of the date of the declaration).

[237] VIS at 37.

an estimated seventy to eighty percent of the market, and its dominance has long raised antitrust concerns.[238] When competition disappears, prices rise, innovation slows, and public agencies— already operating under tight budgets—are forced to pay more for less. Hytera's presence has driven down costs and spurred technological advancements benefiting taxpayers and improving public safety. That public interest favors maintaining a diverse marketplace rather than granting Motorola unchecked power. The tragedy involving Motorola in Kerr County highlights why competition is not merely an abstract principle, and why the failure to preserve competitive markets can have fatal consequences.[239] Eliminating Hytera would leave communities vulnerable to the shortcomings of a monopolized market.

## B. *There is No Agreed Definition of Motorola's Trade Secrets*

Motorola's proposed conditions also are not administrable. They are largely keyed to the illusory term "Motorola Trade Secret Information," as if that were an agreed piece of information the Court could simply use as a reference guide. While Motorola purports to import the record *in the civil case* to define the scope of relief to be awarded *in this criminal case*, as discussed above, the record in the civil case falls far short of providing clear definitions.

The trade secret record in this case is also anything but clear. The government's indictment purports to list fifteen trade secrets that do not directly map to the twenty-one trade secrets asserted in the civil case. The government served an expert report adapted from Motorola's opening report

---

[238] *See, e.g.*, Donny Jackson, *UK Court of Appeal Rules Against Motorola Solutions, Solidifies Price Controls on Airwave TETRA System*, IWCE's Urgent Commc'ns (Feb. 2, 2025), https://urgentcomm.com/land-mobile-radio/uk-court-of-appeal-rules-against-motorola-solutions-solidifies-price-controls-on-airwave-tetra-system (discussing UK court's finding that Motorola had overcharged emergency services in the UK more than $250 million).

[239] Mike Baker, Danny Hakim & Blacki Migliozzi, *A Costly Radio System Faltered When Texas Needed It Most*, N.Y. Times (Oct. 23, 2025), https://www.nytimes.com/topic/destination/texas. (discussing anticompetitive award of $7M emergency radio contract to Motorola in Kerr County, Texas and failure of those radios during recent flooding)

in the civil case—ignoring the countless admissions and impeachment that followed in rebuttal reports, depositions, and cross-examination at trial. And there has been no evidentiary presentation to this Court that would enable it to administer Motorola's proposed remedies amid these hotly disputed issues.

### C.    Hytera Has Already Implemented Measures to Identify and Quarantine Motorola's Confidential Information.

The quarantine-and-removal process Motorola proposes is inappropriate and unnecessary. As Judge Norgle acknowledged when denying Motorola's request for a quarantine-and-removal order in the civil case, such an order "would transform the reasonable royalty into an injunction."[240] Moreover, notwithstanding that Judge Norgle denied Motorola's request, Hytera has already voluntarily undertaken efforts to quarantine and remove certain Motorola trade secret information, including the files of co-defendants GS Kok, YT Kok, Samuel Chia, and Peiyi Huang.[241]

### D.    Motorola's Request for Judicial Oversight Over All New Hytera Products Is Unjustified.

Title 18 U.S.C. § 3563(b)(5) contemplates that restraints on a defendant's ability to "engag[e] in a specified occupation, business, or profession" must "bear[] a reasonably direct relationship to the conduct constituting the offense."[242] Section 3563(b)(5) does not bless the kind of restraint that Motorola is requesting here. To begin, § 3563(b)(5) by its terms applies only "in the case of an individual." Further, restrictions on a defendant's ability to engage in a specified business must "bear[] a reasonably direct relationship to the conduct constituting the offense."[243]

---

[240] Ex. 5, Civil Dkt. 1289 at 40.
[241] Civil Dkt. 908-7, ¶ 11 (Declaration of Jim Luo).
[242] 18 U.S.C. § 3563(b)(5).
[243] 18 U.S.C. § 3553(b)(5); see also United States v. Farmer, 755 F.3d 849, 855 (7th Cir. 2014) ("In other words, the statutory provision and sentencing guidelines make clear that an occupation restriction requires a nexus between the underlying offense of conviction and the occupational ban.").

There is no relationship between Motorola's request that Hytera obtain pre-sale judicial approval for "any new product" and the offense of conviction here. Hytera sells many products other than DMR radios—the technology at issue in the criminal case—including body cameras, analog radios, TETRA radios (digital radios for mission-critical applications), and radios that utilize cellular technology.[244] And even as to DMR radios, Motorola does not dispute that Hytera sells numerous DMR radios that do not incorporate information taken from Motorola.[245] Accordingly, there is no justification for requiring Hytera to seek judicial preapproval for sales of *all* DMR radios, much less "any new product."

Motorola also offers no suggestion for how this Court or an appointed expert could conduct the requested "examination" of Hytera's new products. Presumably, Motorola intends that the examiner would seek Motorola's permission prior to blessing Hytera's launch of any new product, but this would amount to asking the fox to guard the hen house. Perhaps Motorola intends that the Court or an expert would rifle through the eight-year-long docket in the civil case, aided by thousands of pages of expert reports from both sides, to determine the scope of Motorola's trade secrets and the extent to which any new Hytera product uses them. Putting the obvious practical difficulties of such a task aside, this kind of examination would require consideration of how the state of the art (or Hytera's independent development) has evolved since the charged theft of trade secrets in 2008, because Hytera is entitled to use public information or independently developed information, *even if it is similar to Motorola's information*.[246] This condition is unworkable.

---

[244] *See* Ex.12, 2024 Annual Report at 12–21.

[245] Civil Trial Tr. (Wicker) at 5123:15–18 (Motorola's expert acknowledging Hytera's commercial-tier products "did not use Motorola's trade secrets").

[246] 18 U.S.C. § 1839(3)(B) (defining "trade secret" to encompass only information that is "not . . . generally known" or "readily ascertainable" to others who could "obtain economic value" from the information); 18 U.S.C. § 1839(6)(B) ("improper means" of acquiring a trade secret "does not include reverse engineering, independent derivation , or any other lawful means of acquisition").

### E. Motorola's Request for Negative Publicity About Its Largest Competitor Is Unjustified

Under U.S.S.G. § 8D1.4(a), the Court can order Hytera to "publicize the nature of the offense committed, the fact of conviction, the nature of the punishment imposed, and the steps that will be taken to prevent the recurrence of similar offenses," but Motorola's request for negative publicity goes far beyond what the Guidelines contemplate. For one thing, Motorola asks for an order requiring third parties that are not before the Court—and which may not be subject to its personal jurisdiction—to publicize the offense.[247] For another, Motorola would require Hytera to not just publicize this proceeding, but to do so "on any of its corporate external-facing websites" for at least a year, which taken literally would extend to numerous web pages that have nothing to do with public relations.[248]

Motorola makes no attempt to show that its request for negative publicity about its largest competitor is "reasonably related" to any of the "factors set forth in section 3553(a)(1) and (a)(2)."[249] And to the extent that those factors would be served by negative publicity about Hytera, Motorola's own publicity efforts are more than sufficient.[250]

---

[247] VIS at 38 ("Hytera's distributors should also be required to post this notice on their websites that reference Hytera in any way.").

[248] *See, e.g.*, Hytera Global Service, Hytera, https://www.hytera.com/en/services/find-service-center.html; https://www.hytera.com/en/services/feedback/popular.html (last visited Nov. 3, 2025).

[249] 18 U.S.C. § 3563(b).

[250] *See, e.g.*, Dkt. 321 at 3 ("Hytera estimates that more than more than 400 articles have been written about the legal disputes between Motorola and Hytera and the government's subsequent indictment of the company. Many of these articles stem from Motorola's own repeated comments to the media. Motorola Chief Executive Greg Brown has given multiple media interviews where he discusses the civil and criminal cases, including unequivocally asserting that Hytera has 'already been convicted. They stole patents. They stole trade secrets. They copied source code.'" (emphasis and footnote omitted)).

Numerous media outlets are and have been tracking the tortured litigation between and about Motorola and Hytera, as well as court rulings in those cases.[251] Requiring Hytera to publish additional negative publicity about itself is simply unnecessary.

### F. Motorola's Anti-Sale Injunction Is Unjustified and Duplicative

Motorola asks this Court to enjoin worldwide sales of certain products. Motorola's request covers "Accused Products," which it defines as all products adjudicated in the civil trial, as well as an undefined set of "alleged redesigns"—without regard to whether any such redesign is substantially derived from Motorola's trade secrets. Nor does Motorola propose any end date for the proposed injunction, even though its most aggressive estimate for the time it would have taken to develop the entirety of the trade secrets (i.e., without adjusting for the small portion Hytera purportedly used or accounting for Hytera's pre-existing development) has nearly elapsed.[252]

In any case, Motorola has already asked for the same relief in the civil case—essentially reversing course on the current reasonable royalty regime (which, as discussed, provides a windfall to Motorola). An injunction here would either be redundant to or in conflict with the forthcoming decision in the civil case.

### G. Motorola's Request for a Compliance Monitor Should Be Denied

Motorola makes numerous requests ostensibly designed to ensure that Hytera maintains an effective compliance program, *see* VIS at 38, but Motorola has no idea what Hytera's compliance

---

[251] *See, e.g.*, Lauraann Wood, *Hytera 'Can't Be Trusted,' Motorola Says in Push for Payment*, Law360 (Oct. 14, 2025), (https://www.law360.com/articles/2399434/hytera-can-t-be-trusted-motorola-says-in-push-for-payment); Blake Brittain, *China's Hytera Pleads Guilty to Stealing Motorola Solutions Radio Technology*, REUTERS (Jan. 14, 2025), (https://www.reuters.com/legal/government/chinas-hytera-pleads-guilty-stealing-motorola-solutions-radio-technology-2025-01-14/); Richard Vanderford, *China's Hytera Pleads Guilty to U.S. Charge in Motorola Solutions' Trade Secrets Theft Case*, Wall Street Journal (Jan. 14, 2025), https://www.wsj.com/articles/chinas-hytera-pleads-guilty-to-u-s-charge-in-motorola-solutions-trade-secrets-theft-case-19281bad?reflink=desktopwebshare_permalink.
[252] *See* Civil Trial Tr. (Rangan) at 2020:18–2025:5.

program even looks like. While Hytera freely admits that its compliance program circa 2008 was insufficient to detect and prevent the offense of conviction, IP compliance at Hytera has come a long way in the intervening 15+ years. Probation, unlike Motorola, was provided extensive information about Hytera's present-day compliance program,[253] and tellingly saw no need to recommend any "additional measures," let alone those that would effectively entail appointment of a compliance monitor.[254]

> 1. Motorola's "Additional Measures" Are a Thinly Veiled Request for a Compliance Monitor

Recent DOJ guidance recognizes that "a monitor should never be imposed for punitive purposes and the scope of any monitorship should be appropriately tailored to address the specific issues and concerns that created the need for the monitor while minimizing expense, burden, and interference with the business."[255]

Perhaps because of this guidance, instead of expressly requesting appointment of a compliance monitor, Motorola tiptoes up to the line and asks the Court to require Hytera to "submit periodic reports to the court from a Court-approved independent compliance expert" and "to develop and implement an effective compliance and ethics program."[256] Coupled with a requirement to that "Hytera shall submit complete, detailed books and records, including of its subsidiaries" to such an expert,[257] VIS at 38, Motorola is asking for a de facto compliance monitor without acknowledging that appointing such a monitor in a case where the defendant has already implemented an effective compliance program contravenes DOJ guidance.

---

[253] PSR ¶¶ 86–88, Def. Ver. at 34–47.
[254] *See* VIS at 38.
[255] DOJ, Memorandum on Selection of Monitors in Criminal Division Matters at 2 (May 12, 2025), https://www.justice.gov/criminal/media/1400036/dl?inline.
[256] VIS at 38.
[257] VIS at 38.

2.   Hytera Has Developed an Effective Compliance Program That Is Far
     More Robust Than the One in Place in 2008

Over the past fifteen years, Hytera has spent enormous time and money developing a compliance program not only designed to catch the type of misconduct that occurred in this case, but also one that fits Hytera's current status as a global publicly traded company. As explained in detail in the PSR, three events significantly influenced the growth of Hytera's compliance program.[258] First, in 2011 Hytera went public, thereby becoming subject to numerous securities rules and regulations that required it to develop internal controls, conduct regular audits and assessments, and provide reports to management, investors, and government agencies. This regulatory scrutiny has required Hytera to focus on compliance in a more systematic way than it was doing back in 2008 when the charged conduct occurred.

Second, with respect to intellectual property, in 2013 the Chinese government promulgated requirements mandating that Chinese companies develop robust policies and procedures to protect both their own *and third-party's* intellectual property rights.[259] In response, and also following its litigation with Motorola, over the past decade Hytera has created what is effectively a stand-alone IP compliance program that includes approximately *twenty* IP-specific policies and procedures and involves dedicated oversight by multiple divisions and management members (including those on Hytera's board of directors and its CEO).[260] Hytera's IP compliance program is even audited and certified annually by an independent third-party to ensure it meets the highest possible IP compliance standards.[261]

---

[258] PSR ¶¶ 86–88.

[259] *See* Ex. 13, China National Standards, *Enterprise Intellectual Property Management* (Mar. 1, 2013).

[260] *See* Ex. 14, Intellectual Property Management Manual (7th ed.), Hytera Communications Corporation Limited, Shenzhen Hytera Technical Services Co., Ltd. (May 13, 2024).

[261] *See* Ex. 15, Audit Plan for Intellectual Property Management System; Ex. 16, Annual Supervision Audit Qualification Notice (Oct. 18, 2024).

Finally, with the ascendancy of Mr. Yelin Jiang to Executive Vice President in 2017, and then CEO in 2021, Hytera has focused on increasing risk assessments, developing necessary policies, training employees in compliance-related topics, implementing whistleblower reporting mechanisms, developing investigative protocols, and ensuring that management dedicates the resources necessary to make Hytera's compliance program successful overall. Mr. Jiang is also committed to ensuring that the company never becomes embroiled in the type of litigation it currently is with Motorola.

In light of all of these robust compliance efforts, Hytera is committed to ensuring that the mistakes of 2008 will never be repeated.

Date: November 10, 2025                    Respectfully submitted,

                                           */s/ Scott M. Richey*

Rachel M. Cannon
Christopher S. Niewoehner
STEPTOE LLP
227 West Monroe Street, Ste. 4700
Chicago, IL 60606
Telephone: (312) 577-1300
rcannon@steptoe.com
cniewoehner@steptoe.com

Boyd Cloern (*pro hac vice*)
Scott Richey (*pro hac vice*)
STEPTOE LLP
1330 Connecticut Avenue NW
Washington, DC 20036
Telephone: (202) 429-3000
bcloern@steptoe.com
srichey@steptoe.com

## CERTIFICATE OF SERVICE

I, Scott M. Richey, an attorney, hereby certify that on November 10, 2025, I caused a true and correct copy of the foregoing submission to be served via the Court's ECF system upon all counsel of record.

/s/ Scott M. Richey
Scott M. Richey